STATE of Minnesota, Respondent,

v.

Bruce Philip LARSON, Petitioner, Appellant.

No. C2–88–2379.

Supreme Court of Minnesota.

July 12, 1991.

John Stuart, State Public Defender, Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, D. Gerald Wilhelm, Martin County Atty., Fairmont, for respondent.

COYNE, Justice.

In *State v. Larson*, 453 N.W.2d 42 (Minn. 1990), we affirmed the child sex abuse conviction of the defendant against a number of contentions, including the contention that extrajudicial statements by the complainant were improperly admitted against the defendant in violation of his right of confrontation. We decided *Larson* on March 23, 1990, and denied defendant's petition for rehearing on May 15, 1990. Subsequently, on June 27, 1990, the United States Supreme Court filed its opinion in *Idaho v. Wright*, ——— U.S. ———, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Then on October 1, 1990, the United States Supreme Court granted defendant's petition for a writ of certiorari, vacated the judgment of this court and remanded the case to this court for "further consideration in light of" the *Wright* case. *Larson v. Minnesota*, ——— U.S. ———, 111 S.Ct. 29, 112 L.Ed.2d 7 (1990). The parties thereafter filed further briefs and oral argument was held. After careful reconsideration of the case in light of *Wright*, we reaffirm the judgment of conviction.

In late April of 1987 complainant, B., not quite 4 years old, complained to her mother of vaginal soreness and burning urination. On May 1, B.'s mother, who had custody of the child subject to defendant father's visitation privileges, took her to a family practice clinic for diagnosis and treatment. The physician's assistant, who conducted the examination, saw redness and swelling around the vaginal opening. Suspecting abuse, the examiner, after assuring B. that she was there to "assist her," asked B. if anyone other than her mother or herself had touched her vaginal area. B. initially responded "no" and turned away. When the examiner repeated the question, B. said "yes," that "Daddy" had touched her there. When the examiner asked whether her daddy had touched her there to help wipe her or dry her, B. said "yes," but then, when asked "where," pointed to her abdomen. When asked with what he had touched her, B. replied that "Daddy" had touched her "between [the] legs" with "his bone" that "came out of his pants." Asked whether this had happened before, B. said "yes," that "he laid me on the couch and he rubbed my belly * * * until my skin came off." B. further stated that it hurt "because he pressed hard against her tummy and hugged her real hard," and that she had asked him to stop. She further described feeling wet on her abdomen and having to wipe herself dry afterwards. Although B. apparently told her mother when the examiner briefly left the room that she was "only kidding," B. immediately recanted this to the examiner and explained that "she didn't want to have her father in trouble." Indeed, the examiner observed that B. was "very nervous and very protective of her father," whom B. "obviously loved."

Visits were temporarily discontinued pursuant to a court order obtained on May 2 in the district court in the county where defendant resides.

On May 7, B. made equally damaging statements to a child protection specialist.

Defendant retained an attorney and obtained a court order in June allowing supervised visits.

A doctor who talked with B. four times as part of a psychological evaluation concluded that there was a "high probability" that she had been involved in "inappropriate sexual activity."

Nonetheless, on July 31, 1987, the court ordered reinstatement of defendant's unsupervised visitation privileges.

In August B. began weekly psychotherapy with Dr. Susan Lund, a clinical psychologist specializing in the treatment of abused children who is employed at Midwest Children's Resources Center. These one hour long weekly sessions, conducted largely outside the mother's presence, were for the purpose of therapy, not substantiating the existence of abuse. During a session held on October 22, 1987, B., prompted by Dr. Lund's questions about B.'s trouble with waking and with nightmares, particularly at defendant's house, said that defendant "pushed at her with his penis and wiggled his penis on her." Using anatomically correct dolls, B. demonstrated by pushing the father doll's penis "at her [doll's] vaginal area" and "wiggl[ing] his penis horizontally across the clitoris." B. said that this "felt warm and nice." She said it happened during the recently reinstated unsupervised visits.

Hennepin County, the county of the mother's residence, obtained an order assuming custody of both B. and her younger brother and terminating defendant's visitation privileges. A social worker and a police officer interviewed B. in November. The prosecution was commenced in December of 1987 in Martin County where the abuse occurred.

The pre-trial suppression hearing was held in June of 1988 shortly before trial was to commence. That hearing was held on the state's motion for permission to use the extrajudicial statements of B. and on defendant's motion to suppress the statements on the ground that admitting them would violate defendant's right of confrontation. For purposes of the suppression hearing the parties stipulated that B., then 5, was incompetent to testify. The trial court rejected defendant's arguments in favor of suppression and ruled that the statements were admissible under Minn.Stat. § 595.02, subd. 3 (1988). Afterward, the trial court granted the defense a continuance so that the defense could try to obtain expert testimony and also so the defense could decide whether to call B. to testify.

At the reconvened suppression hearing in August, shortly before the rescheduled trial date, defendant renewed his suppression motion, relying on *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). The trial court ruled that *Coy* did not apply.

On the first day of trial defendant made a continuing objection to the statements on the ground that their admission would violate his right of confrontation. Defendant also said he intended to call B. as a witness. The trial court therefore conducted an in-chambers competency hearing and determined that B. was competent, thereby enabling defendant to call B. as a witness if he wished. Defendant, however, decided not to call B. as a witness.

■ In our earlier decision we held, *inter alia*,[1] that the statements were admissi-

---

1. In *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980), the Court set forth a "general approach" for determining when incriminating hearsay statements admissible under an exception to the hearsay rule satisfy the requirements of the Confrontation Clause. Under the general approach the prosecution "must either produce, or demonstrate the unavailability of, the declarant", 448 U.S. at 65, 100 S.Ct. at 2538, and must demonstrate that the declarant's statement bears adequate "indicia of reliability," 448 U.S. at 66, 100 S.Ct. at 2538. However, as we said in *Larson I*, the Court in *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1125–26, 89 L.Ed.2d 390 (1986), made it clear that "the unavailability of the declarant is not always prerequisite to admissibility of hearsay evidence against the defendant in a criminal case." 453 N.W.2d at 46. In *Inadi* the Court made an exception to the general unavailability requirement in a case involving admission of statements by nontestifying but available co-conspirators of the defendant. The Court said that the unavailability rule was developed in cases involving admission of former testimony, where there is good reason for a rule of preference for the live testimony unless the witness is shown to be unavailable, specifically, "former testimony often is only a weaker substitute for live testimony [and] seldom has independent evidentiary significance of its own." 475 U.S. at 394, 106 S.Ct. at 1126. The same logic does not apply equally to those extrajudicial statements which derive much of their significance from the context in which they are made, a context very different from trial. *Id.* at 395–96, 106 S.Ct. at 1126. The Court rejected an unavailability requirement in the *Inadi* context because it would impose a significant practical burden on the prosecution to insure the availability of declarants even where it was clear neither the prosecutor nor the defense wished to

examine the declarants at trial. As the Court put it:

Any marginal protection to the defendant by forcing the government to call as witnesses those co-conspirator declarants who are available, willing to testify, hostile to the defense, and yet not already subpoenaed by the prosecution, when the defendant himself can call and cross-examine such declarants, cannot support an unavailability rule. We hold today that the Confrontation Clause does not embody such a rule.

*Inadi,* 475 U.S. at 399–400, 106 S.Ct. at 1128–29. We concluded that the same reasoning applied in this case. As we put it:

As in *Inadi,* it is not at all clear that it was in the interests of the defendant that the declarant be called by either side. It may well have been better for the defendant to go to the jury and challenge the ambiguity of the child's statements (when she said that the abuse occurred in defendant's house but would not say who did it) than to have the child called and possibly testify in court that it was defendant who did it.

*Larson I,* 453 N.W.2d at 45–46.

Given the circumstances of the case—including the fact that the statements in question had independent evidentiary significance, the fact that the trial court had conducted a competency hearing and found B. to be competent after the defense expressed a desire to confront the child and cross-examine her, and the fact that the defense, after apparently considering the matter carefully, demonstrated that it did not wish to call B.—we concluded that the *Inadi* reasoning made equal sense in this context. *Id.* at 46.

However, because we recognized "that a defendant who wants to cross-examine an available child witness whose extrajudicial statements are being used by the state should not be compelled to call the child as a witness if the defendant would prefer that the state call the witness," we prospectively adopted a modified version of the approach suggested by Professor Westen and held that "in future cases of this kind the state must, when *expressly* requested by the defendant to do so, call in its case-in-chief an available witness whose hearsay statements are being admitted against the defendant." *Id.* at 47 (emphasis in original), citing Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases,* 91 Harv. L.Rev. 567, 617–18 (1978).

The interpretation of *Roberts* and *Inadi* by the dissenting justice, who was not a member of this court when we filed our earlier opinion, is at odds with that advanced by leading commentators. For example, Professor Haddad, in his analysis of these cases, concludes, contrary to the conclusion of the dissent, that the Supreme Court "has rejected the principle that prefers live testimony over hearsay when the hearsay declarant is available at the time of trial." J. Haddad, *The Future of Confrontation Clause Developments,* 81 J.Crim.L. & Criminology 77, 80–81 (1990). As Professor Haddad puts it, "After

seemingly accepting" a rule of preference in *Roberts,* "the Supreme Court in *Inadi* held that the rule of preference applies only in a narrow class of cases." *Id.* at 81. He goes further and suggests that "[t]he former testimony exception will likely stand practically alone as to the requirement that the prosecution demonstrate the hearsay declarant's unavailability." *Id.* at 82.

Professor Michael Graham, in a perceptive article analyzing *Roberts* and *Inadi,* concludes that "*Inadi* supports the introduction of any available declarant's statement simply because of the defendant's ability to subpoena and examine the declarant as to the subject matter of the statement at trial." M. Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship,* 72 Minn.L.Rev. 523, 587 (1988). Professor Graham argues, however, for a rule requiring the prosecutor offering an out-of-court statement under either a hearsay exemption or exception to produce an available witness "if the circumstances surrounding the making of the statement indicate that it was accusatory when made." *Id.* at 593. In fact, our earlier decision in this case went farther than this and adopted a prospective rule, as a matter of state evidentiary law rather than as a matter of constitutional law, requiring the prosecutor, when expressly requested by the defendant to do so, to call in the state's case-in-chief an available witness whose hearsay statements are being admitted against the defendant. *Larson I,* 453 N.W.2d at 47.

As noted by the editors of the Harvard Law Review, *Wright* focused on the issue of reliability, not on whether a showing of unavailability is a prerequisite to admission of a child's hearsay statements. Note, 104 Harv.L.Rev. 129, 130–31, 138 (1990). Although they argue in favor of a narrowly-defined unavailability requirement in this context, they conclude that it is "unclear" from the several confrontation clause decisions of the Supreme Court whether a showing of unavailability is required. *Id.* at 138, n. 77. Indeed, the Court in *Wright* expressly said that it was not addressing the question. *Wright,* 110 S.Ct. at 3147. And since the Court declined to address the issue in *Wright,* it can hardly be said to have altered its position by the *Wright* decision. (It appears that the Court will address the question in *People v. White,* 198 Ill.App.3d 781, 144 Ill.Dec. 857, 556 N.E.2d 535, *leave to appeal denied,* 133 Ill.2d 570, 149 Ill.Dec. 335, 561 N.E.2d 705 (1990), *cert. granted,* — U.S. —, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991)).

In any event, as we have said, our earlier decision in this case answered the concerns of those thoughtful analysts of the confrontation clause who have argued that if a witness is "available," the prosecutor should have to produce the witness so that the defendant does not have to call the witness in order to confront and cross-examine the witness. We did this by requiring, prospectively, as a matter of state evidentiary law that when the defendant so requests, the prosecutor must call in the state's case-in-chief an available witness whose hearsay

ble under Minn.R.Evid. 803(24) (the residual exception) and Minn.R.Evid. 803(4) (statements for purpose of medical diagnosis or treatment) and that the statements were sufficiently reliable to satisfy the confrontation clause. But, since our decision preceded the United States Supreme Court's decision in *Wright*, we did not have the benefit of the *Wright* analysis, an analysis on which we relied in upholding the admission of extrajudicial statements of a child sex abuse victim in *State v. Lanam*, 459 N.W.2d 656 (Minn.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991).

In *Wright* there were two girls involved, one 5½ and the other 2½ years old. The older girl told her father's female companion, Goodman, that her mother's boyfriend, Giles, had had sexual intercourse with her while her mother covered her mouth and held her down. She said she had seen them do the same thing to her younger sister. Goodman reported the matter to the police and took the older daughter to the hospital, where a medical examination revealed evidence of sexual abuse. Police and welfare officials then took the younger daughter into custody. The same doctor who had examined the older daughter examined the younger daughter.

The main issue in *Wright*, for our purposes, was whether the admission at trial under the Idaho residual exception to the hearsay rule of statements made by the *younger girl* to the doctor violated the mother's right of confrontation. The Court reaffirmed that the "indicia of reliability" requirement of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), generally can be met by either of two ways: by demonstrating that the extrajudicial statement "falls within a firmly rooted hearsay exception," or by showing that the statement has "particular guarantees of trustworthiness." *Wright*, 110 S.Ct. at 3147. The Court cited the "excited utterance," "dying declaration" and "medical treatment" exceptions to the hearsay rule as firmly-rooted hearsay exceptions, but concluded that the so-called residual hearsay exception, illustrated by Minn.R.Evid. 803(24), is not firmly rooted for confrontation clause purposes. *Id.* at 3147–49. Since the state in *Wright* conceded that the younger daughter's statements did not fall within a firmly-rooted exception, the Court proceeded to analyze whether the statements possessed "particular guarantees of trustworthiness." *Id.* at 3148. The Court said that trustworthiness guarantees must be shown from the totality of the circumstances that surround the actual making of the statement, not evidence corroborating the statement. *Id.* at 3148–49. As we said in *Lanam* in our summary of *Wright*:

"[T]he focus is not on all the circumstances, including evidence at trial corroborating the child's statements, but only on those circumstances actually surrounding the making of the statements. These circumstances include, but are not limited to, whether the statements were spontaneous, whether the person talking with the child had a preconceived idea of what the child should say, whether the statements were in response to leading or suggestive questions, whether the child had any apparent motive to fabricate, and whether the statements are the type of statements one would expect a child of that age to fabricate."

459 N.W.2d at 661 (citing *Wright*, 110 S.Ct. at 3149–52). Other circumstances identified by the Court in *Wright* include the "mental state" of the child at the time the statements were made and the "consistent repetition" of the child's statements during

statements are being admitted against the defendant. Interestingly, the Eighth Circuit in *United States v. Massa*, 740 F.2d 629, 640 n. 6 (8th Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985), concluded that *Roberts* does not require as much. It concluded that at most *Roberts* places a burden on the government to make a good faith effort to obtain the presence at trial of any witness whose

out-of-court statements it is using against the defendant and that if the government obtains the declarant's presence at trial, "it need not call the witness to testify." *Id.* Whether or not the Eighth Circuit's analysis in *Massa* is correct really does not matter in this case, because, as we said, the defense not only did not ask the prosecutor to call the witness but, after apparently considering the matter carefully, made it

the same interview or conversation. 110 S.Ct. at 3150. In addition to considering whether the child had an apparent motive to fabricate, it would seem that the Court could consider whether the child had an apparent motive to speak truthfully. *State v. Conklin*, 444 N.W.2d 268, 276 (Minn. 1989) (case preceding *Wright*).

Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment*, 67 N.C.L.Rev. 257 (1989), *cited in Wright*, 110 S.Ct. at 3149, points out that the federal rule corresponding to Minn.R.Evid. 803(4) (statements for purpose of medical diagnosis or treatment) is broader than the traditional or long-standing "medical treatment" exception and suggests that possibly only statements covered by the "core" part of Rule 803(4) are admissible without a showing of particularized guarantees of trustworthiness. We believe that the key hearsay evidence in this case, B.'s statements to the medical assistant, falls within the "core" part of Rule 803(4) and should be admissible without any additional showing of particular guarantees of trustworthiness. However, we need not decide the point because we are convinced, after considering the factors surrounding B.'s making of the statements to the assistant, that the statements possessed particular guarantees of trustworthiness.[2]

One key factor is that, unlike the declarant in *Wright*, there is nothing to indicate that B. was taken to the family practice clinic for any purpose other than to have a doctor examine her and determine the reason for the vaginal soreness and burning urination she was experiencing. B. knew she was being examined in a doctor's office and had the same "selfish" treatment-related motive[3] to speak the truth that anyone has when one goes to a doctor's office

sincerely inquiring about one or more symptoms. Second, before beginning the exam the physician's assistant had no preconceived notion that abuse had occurred or that defendant had committed the abuse. Third, on examination the assistant, a person of both experience and presumed integrity, apparently immediately suspected abuse. Fourth, the questions the assistant asked were not the kind of questions that would prompt a child to fabricate the response the questions elicited, including B.'s statement that "Daddy" had touched her "between the legs" with his "bone" that "came out of his pants." Fifth, the story B. told had an immediately apparent "ring of credibility" to it and was not the sort of story that a child of that age would be expected to fabricate. Sixth, B. had no apparent motive to fabricate the claim of abuse. Indeed, just the opposite, she made it clear that she did not want to hurt defendant. Seventh, the assistant, who as we said before is a person of experience and presumed integrity, obviously believed the child.

Of B.'s statements, those made to the physician's assistant clearly were key. B.'s subsequent statements were largely cumulative evidence, evidence which at a minimum was admissible for the non-hearsay purpose of showing that B. was consistent in her allegations of abuse by defendant. *See* Minn.R.Evid. 801(c) (defining "hearsay" as a statement, other than one made by the declarant while testifying at the trial or hearing, "offered in evidence to prove the truth of the matter asserted"). Although we conclude that any error in admitting the subsequent other statements as substantive evidence of guilt was harmless beyond a reasonable doubt, we none-

---

clear that it did not wish to confront and cross-examine her.

2. We disagree with any suggestion that the case should be remanded to the trial court so that the trial court in the first instance may analyze the case in terms of the *Wright* factors. The "heart of the matter of determining whether to admit hearsay is that unreliable evidence should be kept from the jury," which is a "legal determination * * *." *State v. Dana*, 422 N.W.2d 246, 249 (Minn.1988). "Of course, if there is a question

of fact relating to the admission of hearsay evidence," then "the trial court will often receive evidence pro and con on the issue." *Id.* Because there are no significant disputed factual issues relating to the circumstances surrounding the making of the statements in question, there is no need to remand to the trial court.

3. *See* Mosteller, *Child Sexual Abuse and Statements for the Purpose of Medical Diagnosis or Treatment,* 67 N.C.L.Rev. 257, 260–61 (1989).

theless have analyzed the admission of these statements under *Wright.*

■ Of B.'s other statements, those made to the child protection specialist on May 7, to Dr. Lund during therapy, and to the social worker and the police officer on November 24—the least troubling, of course, are the ones made to Dr. Lund during therapy. Those statements were for the purpose of therapy, not the purpose of substantiating the existence of abuse, and were admissible under the "medical treatment" exception, Rule 803(4), which is a firmly-rooted hearsay exception. However, even if the statements were not admissible pursuant to a firmly-rooted hearsay exception, there were "particular guarantees of trustworthiness" sufficient to satisfy the *Wright* confrontation clause analysis. On October 22, 1987, Dr. Lund was questioning B. about B.'s trouble with waking and with nightmares, particularly at defendant's house, when B. said that defendant "pushed at her with his penis and wiggled his penis at her." B., of course, had a "selfish" treatment-related motive for being truthful with Dr. Lund since the purpose of the weekly sessions, of which B. was obviously aware, was to provide therapy for B. Moreover, there is nothing in the record to indicate that Dr. Lund used leading or suggestive questions. Indeed, the weekly sessions began in August and it was not until October 22 that Dr. Lund, using nonleading questions during the discussion of nightmares, elicited the statements. B.'s "acting out" of rescue themes, *e.g.*, adult female dolls rescuing trapped child dolls, immediately following her revelations further enhances the reliability of the statements, as does the fact that B.'s behavior at the time she made the statements was, in the doctor's considerable experience, consistent with that of sexually abused children of that age. In addition, B.'s statements and her demonstration of the sexual abuse using the dolls were certainly not what one would expect from a child of B.'s age who had not been sexually abused. *State v. Sorenson,* 143 Wis.2d 226, 246, 421 N.W.2d 77, 86 (1988), the case cited in *Wright* for this factor, expressly noted the reliability engendered by a child's crude depiction of sexual abuse with anatomically correct dolls and a child's description of wiping herself off. Here, B. used the dolls to demonstrate in detail the positions and movements of defendant and herself during the alleged abuse.

■ The case is almost as strong for the admission of B.'s statements to the child protection specialist on May 7. The child protection specialist testified as to her awareness of the problem of using leading questions with children and there is no indication that she used leading or suggestive questions. B. said that "someone" had put his penis "between her legs and up her butt." She used anatomically correct dolls to demonstrate the abuse, showing herself on her back and her abuser "on top of her, face-to-face." B. would not say who that "someone" was because "she loved her Daddy and she didn't want him to get into trouble." But she said the abuse happened on the living room couch "in her Daddy's house." Later, while crying quite heavily, she volunteered that even though "her Daddy had promised it would never happen again and he was sorry," the abuse had reoccurred. In concluding that B.'s statements to the child protection specialist were admissible under the *Wright* analysis, we rely on some of the factors that we cited in our analysis of the statements to the medical assistant during the initial examination and the statements to the clinical psychologist during the weekly therapy sessions: nonleading questions were asked; the child seemed not motivated to "get" defendant but rather to protect him; the conduct described and demonstrated was not the kind of conduct a child that age would normally be able to describe and demonstrate unless the child had been the victim of sexual abuse. We also note that B.'s emotional state ("crying hysterically") upon making the allegations to the child protection specialist reinforces our conclusion that the statements were sufficiently reliable for confrontation clause purposes.

■ While we cannot say that B.'s statements to the social worker on November 24

were unreliable, because some of the factors indicating reliability were present, we are nevertheless reluctant to conclude that the statements made on that day were sufficiently reliable to satisfy the *Wright* test. The initial questions by the police officer, who was present and participated in the interview, were leading questions that began with the premise that "Daddy hurt" B. The questions asked by the participants were often repetitive and leading, B.'s responses were not particularly spontaneous, and B.'s emotional state appeared almost completely unaffected by her revelations at that time. Because of these factors as well as the documented dangers [4] of the "tag team" approach to interviewing children and the repeated questioning of children and because of the ambiguity in B.'s responses, the circumstances do not sufficiently establish the reliability of these particular statements under *Wright*. However, any error in admitting the statements made on November 24 clearly was harmless error beyond a reasonable doubt.

We conclude that all of the extrajudicial statements except those statements made on November 24 were properly admitted under the *Wright* analysis, and we are satisfied that defendant received a fair trial and was properly convicted of the offense in question. We therefore reaffirm the judgment of conviction.

Affirmed.

TOMLJANOVICH, Justice (dissenting).

I do not agree that the confrontation clause of the sixth amendment permits the state to substitute hearsay for the in-court testimony of an available witness in the particular circumstances presented by this case.

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court articulated a general approach for resolving the conflict between the confrontation clause, guaranteeing an accused person the right to be confronted with witnesses against her or him, and the numerous exceptions to the hearsay rule, permitting out-of-court statements to be offered at trial in place of live testimony. The Court explained that, in order to conform with confrontation clause requirements, "[i]n the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. at 2538 (citations omitted).

Once the state has met this generally applicable burden, it must then demonstrate the hearsay it wishes to introduce is adequately reliable. *Id.* at 65–66, 100 S.Ct. at 2538–39. The state may satisfy this second requirement by demonstrating that the hearsay bears particularized guarantees of trustworthiness or that the hearsay falls within the scope of a "firmly rooted hearsay exception." *Id.* at 66, 100 S.Ct. at 2539.[1]

I agree with the majority that *"Roberts* cannot fairly be read to stand for the radical proposition that *no* out-of-court statement can be introduced by the government without a showing that the declarant is unavailable." *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1125, 89 L.Ed.2d 390 (1986) (emphasis added). Indeed, *Roberts* itself expressly states such a disclaimer. *See* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. ("A demonstration of unavailability, however, is not always required." *Id.*) *Roberts* clearly did *not* establish a rule requiring unavailability be demonstrated *anytime* the state wishes to introduce hearsay as a substitute for live testimony. Rather, it acknowledged that in *most* instances—"in the usual case"—the baseline requirements established by the confrontation clause will not permit intro-

---

4. *See* Minnesota Attorney General's Report on Scott County Investigation, February 12, 1985.

1. "[C]ertain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.'" *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539 (quoting *Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895)) (footnote omitted).

duction of hearsay absent the demonstrated unavailability of the declarant.

However, I firmly disagree with the majority's suggestion that *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), worked any substantial change in the *Roberts* rule. In *Inadi*, 748 F.2d 812 (3d Cir.1984), *rev'd*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Third Circuit concluded that there was no reason to deviate from the unavailability requirement where the government sought to introduce hearsay statements of a non-testifying coconspirator. *See id.* at 818. Given the tremendous advantage such statements provided the government, the court reasoned, requiring the government to demonstrate that live testimony was not an option, owing to the declarant's unavailability, did not seem overly burdensome. *See id.* at 818–19.

The Supreme Court disagreed. It first explained that *Roberts* should not be read without attention to its own factual setting—that is, where "the prosecution seeks to admit testimony from a prior judicial proceeding in place of live testimony at trial." *Inadi*, 475 U.S. at 393, 106 S.Ct. at 1125. Because *Roberts* articulates a general, but not a necessary rule, it obviously cannot be extended to instances clearly distinguishable from the proffered introduction of prior hearing testimony to replace testimony in court.

The Court then went on to explain why the Third Circuit was incorrect in concluding that out-of-court coconspirator statements were not sufficiently dissimilar from testimony given in a previous judicial proceeding to justify relaxing the unavailability requirement:

> There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements. Unlike some other exceptions to the hearsay rules, or the exemption from the hearsay definition [for coconspirator statements], former testimony often is only a weaker substitute for live testimony. It seldom has independent evidentia-

ry significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. When two versions of the same evidence are available, long-standing principles of the law of hearsay, applicable as well to Confrontation Clause analysis, favor the better evidence. But if the declarant is unavailable, no "better" version of the evidence exists, and the former testimony may be admitted as a substitute for live testimony on the same point.

*Id.* 475 U.S. at 394–95, 106 S.Ct. at 1125–26 (citation omitted).

While clearly justifying application of the unavailability rule where the government seeks to introduce hearsay in the form of prior testimony, the Court concluded this rationale does not justify extending that rule to coconspirator statements. *See id.* at 395, 106 S.Ct. at 1126. Such statements, the Court reasoned, are independently valuable as evidence of the context in which the conspiracy existed and typically can not be replicated by in-court testimony. In part, this is because the coconspirator-declarant will have changed from the defendant's partner in a criminal enterprise to a suspect or co-defendant, with interests entirely adverse to those she or he had as part of the conspiracy. It therefore "is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force." *Id.*

The Court further noted the substantial practical burdens applying the unavailability rule to coconspirator statements would place on prosecutors, often requiring the government to transport incarcerated individuals to and from court, or to maintain constant information as to the whereabouts of unincarcerated suspects. *See id.* at 399, 106 S.Ct. at 1128. Particularly where the defendant's interests clearly would not be furthered by the opportunity to examine

the declarant at trial, the imposition of such burdens can not be justified. *See id.*

Thus, the Court concluded, the same reasons that support requiring a demonstration of the declarant's unavailability prior to introducing hearsay statements in the form of previous testimony do not justify extending that requirement to out-of-court statements made by a non-testifying coconspirator, in large part owing to the independent evidentiary value such statements bear, the marginal protection extending the requirement would provide a defendant who has little or no interest in examining the declarant at trial, and the substantial burdens the requirement would place on the government.

Taken together, *Roberts* and *Inadi* establish a general presumption in favor of live, in-court testimony, absent a showing of unavailability coupled with demonstrated reliability of the hearsay offered in substitution, and a set of reasons for departing from that presumption with respect to unavailability. I do not agree with the majority that any subsequent Supreme Court decision, and particularly *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), alters this arrangement.

In *Wright,* the Court unambiguously stated that it was *"[a]pplying the Roberts* approach * * *." *Id.* at ——, 110 S.Ct. at 3147 (emphasis added). Taking as given that the child-declarant was unavailable for *Roberts* purposes because she was determined to be incapable of communicating with the jury, the Court moved on to the second prong of the *Roberts* test—whether the hearsay proffered by the state was sufficiently reliable to satisfy confrontation clause requirements. *See id.* I find it curious that the majority does not directly address this point in reviewing its earlier decision, on express instruction from the Court, "in light of *Idaho v. Wright.*" It seems to me the obvious implication of the post-*Wright* remand of *Larson I* is *not*

that this court's conclusion as to the *reliability* of the proffered hearsay was flawed, but rather that its decision to circumvent the *unavailability* requirement was in error.

In my opinion, the state has not succeeded in demonstrating that the rationale underlying the *Roberts* rule fails to support application of that rule in this instance. Indeed, the factual setting here seems to track very closely the circumstances *Inadi* itself suggests justify excluding hearsay absent the declarant's demonstrated unavailability. The state is simply attempting to replace live, in-court testimony with something the defendant can not challenge in a situation where the replacement clearly is *not* the best evidence available.

Unlike the circumstances addressed in *Inadi,* the child-declarant here did not make out-of-court statements that are virtually irreplicable in court. Her circumstances and interests have not substantially changed so as to cast doubt on her willingness to testify truthfully. Finally, there is no particular burden placed upon the state in requiring that it call her as a witness, evidenced by the majority's "prospective evidentiary rule" permitting future defendants to demand such a declarant be produced.

Thus, the state has not met its burden of demonstrating both that the reasons underlying *Roberts* are inapplicable to the out-of-court statements at issue here and that the grounds for diverting from *Roberts'* general rule outweigh any benefit applying that rule might provide the defendant. For this reason, the majority's "quick fix" evidentiary rule—a prospective requirement that the state call the available declarant if requested to do so by the defendant—is no solution. *Roberts* defines introduction of the hearsay at issue as a *constitutional* violation. Declaring a new rule of evidence that does not even apply to *this* defendant does nothing to remedy that violation.[2]

**2.** Because introduction of the hearsay at issue does not clear the baseline standard established by the confrontation clause, the majority's reliance on Minn.R.Evid. 803(24), the "residual exception" to the hearsay prohibition, is misplaced. As the Supreme Court stated in *Idaho v. Wright,*

Although we have recognized that hearsay rules and the Confrontation Clause are generally designed to protect similar values, we

I would hold that in this particular instance, absent a demonstration that the child-declarant is unavailable to testify, the confrontation clause of the sixth amendment prohibits introducing that child-declarant's out-of-court statements to prove the truth of the facts they assert. This case should be remanded for a new trial.

have also been careful not to equate the Confrontation Clause's prohibition with the general rule prohibiting the admission of hearsay statements. The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. —— U.S. at ——, 110 S.Ct. at 3146 (citations omitted).

Beyond the fact that satisfying an evidentiary rule does not automatically demonstrate constitutionality, I also disagree with the majority's

conclusion that the child-declarant's statements are admissible pursuant to the residual exception. That exception requires a judicial determination that, among other things, "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts * * *." Minn.R.Evid. 803(24)(B). Given the child-declarant's competence to testify, I do not believe the hearsay at issue is the most probative evidence the state may reasonably be asked to procure.