**STATE of Minnesota, Respondent,**

v.

**Joseph Peter HOLLANDER, Appellant.**

No. C2–98–648.

Court of Appeals of Minnesota.

March 9, 1999.

Michael A. Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN; and Paul M. Malone, Murray County Attorney, Slayton, MN (for respondent).

John M. Stuart, State Public Defender, Rochelle R. Winn, Assistant State Public Defender, Minneapolis, MN (for appellant).

Considered and decided by HARTEN, Presiding Judge, SCHUMACHER, Judge, and PETERSON, Judge.

## OPINION

PETERSON, Judge.

On appeal from a conviction for second-degree criminal sexual conduct, Joseph Hollander argues that the district court's admission into evidence of an interview of the child-victim with a social worker violated Minn.Stat. § 595.02, subd. 3, and his constitutional right to confront the witnesses against him because the victim did not testify at trial and the district court did not make a finding that the victim was unavailable to testify. Hollander also challenges other evidentiary rulings. We affirm.

## FACTS

When the victim, K.H., was four years old, she stayed with her paternal grandmother

for 17 days. Hollander, who is K.H.'s father, was present for three days during the visit. A week or two after the visit, K.H. told her mother, J.D., that "she loved grandma, but she hated her daddy." J.D. asked why K.H. hated her father, and K.H. said because he played "butt games" with her. When J.D. asked what K.H. meant by butt games, K.H. got very upset and, after further questioning, pointed at her vagina, "kind of" held it, and said that it hurt "really bad" and that she did not want anybody to touch her.

The next day, J.D. further questioned K.H. about butt games. J.D. testified:

> [K.H.] said that, um, daddy used his tail in my vagina and I said a tail, what's that, and she said, you know, that thing he goes to the bathroom with. He put that in my vagina and it hurt really bad and, um, she told me about a tongue ring and she told me about, um, a toy that he used on her butt and I asked her, well, what kind of toy, I don't—I don't understand, and she said I can't describe it. It's not like one of her toys. She couldn't explain it to me.

After contacting police, J.D. was referred to CornerHouse, an independent agency that assists police and child protection services in investigating allegations of sexual abuse of children, and made an appointment to have K.H. examined there. J.D. testified that, before the interview, she told K.H. that K.H. would be examined physically and would talk to doctors about what she had told J.D. about Hollander.

K.H. was interviewed at CornerHouse by Judith Weigman, a licensed social worker and child interview specialist. Weigman began the interview by asking K.H. background questions about her and her family, which K.H. answered correctly. K.H. identified herself as a girl and labeled body parts on male and female dolls. K.H. identified the male doll's penis as a "pee-pee" or "tail."

Weigman then asked K.H. about what kind of touches she liked, and K.H. said that she liked hugs. When Weigman asked whether K.H. received kisses from anyone, K.H. responded, "Only my dad." K.H. stated that Hollander kissed her at his house, that he kissed her on the lips and vagina and nowhere else, that it hurt when he kissed her

on the vagina, and that his mouth stayed on her vagina. When Weigman asked K.H. whether Hollander touched her with any other part of his body, K.H. responded, "Yeah, his tail." During questioning about what Hollander did with his "tail," K.H. said that she and Hollander had watched a bad movie, which K.H. described as a butt movie. K.H. said Hollander kissed the butts on the television. In response to a question about the movie, K.H. said that her daddy's butt was like a "tail" and that he let her kiss his "tail." When asked how she knew that Hollander wanted her to kiss his "tail," K.H. said that he asked her to do it. K.H. stated that she and Hollander took their clothes off when they played butts. K.H. also said that Hollander had something on his nose and on his tongue that hurt her, which she identified as earrings. Hollander admitted having a ring on his tongue.

Weigman asked K.H. to demonstrate with the male and female dolls what happened when K.H. and Hollander played butts. K.H. showed how Hollander placed his "tail" on her vagina. Without prompting from Weigman, K.H. said, "And this is what else he did." K.H. then showed how Hollander put his "tail" in her butt and said that it burned when Hollander did that. Weigman asked K.H. whether Hollander had touched her anyplace else on her body, and K.H. showed the male doll's penis going into the female doll's vagina. Weigman asked whether Hollander's "tail" went into K.H.'s vagina or just on top of it, and K.H. said that "it just went in there." When asked whether Hollander ever placed his hands on her body, K.H. indicated that he put his hands and fingers on her vagina and said that he "just put his hands in there and takes it out." Weigman also asked whether Hollander put his mouth anyplace on K.H. K.H. stated that Hollander stuck his tongue in her butt and demonstrated by pulling the male doll's tongue out of its mouth.

Weigman testified that she had been a child interview specialist for more than seven years, that she had conducted more than 1,200 videotaped interviews of child sex abuse victims, and that sexual abuse had been substantiated in 50 to 60 percent of the

cases. Weigman described K.H. as an extremely competent witness and very articulate, comfortable, and expressive for a four-year-old. Weigman concluded that Hollander had sexually abused K.H. She based her conclusion on her experience in interviewing children, on the consistency of K.H.'s statements throughout the interview, and on K.H.'s affect, behaviors, and demonstrations. Weigman also considered it significant that K.H. spontaneously made statements about touches by Hollander.

After the interview with Weigman, a pediatrician, Dr. Linda Thompson, examined K.H. Thompson found K.H.'s genital area to be normal. Thompson explained that, when a younger child is sexually abused, the hymen typically is undamaged because an adult penis is too large to reach it and that any other damage to the genital area, such as bruising or superficial irritation, would heal within a matter of days.

Thompson discovered venereal warts in K.H.'s anal area. The virus that causes venereal warts can be transmitted through sexual contact or during the birth process. Because K.H.'s venereal warts were in an early stage of development, Thompson opined that the virus that caused them had not been transmitted to K.H. during birth. Thompson testified that the stage of development of K.H.'s warts was consistent with the type of sexual abuse described by K.H. and with her being sexually abused several months earlier. A carrier of the virus that causes venereal warts may not know that he or she has the disease because it frequently remains dormant and there is not a medical test to detect its presence.

J.D. testified that during the previous three years, K.H. had had a series of vaginal yeast and urinary tract infections. During that time, Hollander watched K.H. every other Sunday. J.D. testified that K.H. first mentioned butt games during the winter of 1995, but J.D. did not understand what she meant and K.H. did not explain. During that time, Hollander was watching K.H. three or four days a week and at night while J.D. worked and attended school. J.D. testified that after reporting the sexual abuse, K.H. began frequently taking off her clothes and masturbating and that she had not done that previously.

Hollander testified in his own defense. He denied having any sexual contact with K.H. He denied watching pornographic movies at his mother's house during K.H.'s visit. Hollander's mother testified that she was present during the entire time of Hollander's three-day visit; to her knowledge, Hollander was never alone with K.H.; and she did not observe any inappropriate behavior by Hollander toward K.H. Hollander's sister testified that she was present during Hollander's visit; she did not observe any inappropriate behavior by Hollander toward K.H.; and K.H. always seemed happy around Hollander.

## ISSUES

I. Did the district court err in admitting into evidence K.H.'s interview with Weigman?

II. Did the district court err in admitting into evidence (A) K.H.'s statement that Hollander had abused her friend; (B) J.D.'s testimony that Hollander bragged about starting a chlamydia epidemic; and (C) Weigman's opinion that Hollander had sexually abused K.H.?

## ANALYSIS

### I.

■ Hollander argues that the admission into evidence of K.H.'s interview with Weigman violated Minn.Stat. § 595.02, subd. 3 (1996), and his constitutional right to confront the witnesses against him because K.H. did not testify at trial and the district court did not find that she was unavailable as a witness. Evidentiary rulings rest within the trial court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990).

**Minn.Stat. § 595.02, subd. 3.**

■ The district court concluded that K.H.'s interview with Weigman was admissible under Minn.Stat. § 595.02, subd. 3 (1996). The circumstances relevant to the determina-

tion of the admissibility of a child-victim's out-of-court statements regarding sexual abuse are basically the same whether the court is determining admissibility pursuant to Minn.Stat. § 595.02, subd. 3, or pursuant to Minn. R. Evid. 803(24). *State v. Edwards,* 485 N.W.2d 911, 915 (Minn.1992). *Compare* Minn.Stat. § 595.02, subd. 3 *with* Minn. R. Evid. 803(24). "[T]here is no need to rely on the statute if evidence is admissible pursuant to Rule 803(24)." *Id.; see also State v. Larson,* 472 N.W.2d 120 (Minn.1991) (*Larson II* ) (district court admitted child-victim's out-of-court statements under Minn.Stat. § 595.02, subd. 3; supreme court concluded that statements were admissible under Minn. R. Evid. 803(24) and did not determine admissibility under Minn.Stat. § 595.02, subd. 3).

We, therefore, first consider whether the interview was admissible under Minn. R. Evid. 803(24). Minn. R. Evid. 803(24) creates a residual exception for a statement not covered by a specific exception to the hearsay rule

but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

■■ In determining whether an out-of-court statement is admissible under Minn. R. Evid. 803(24), "trustworthiness guarantees must be shown from the totality of the circumstances that surround the actual making of the statement." *Larson II,* 472 N.W.2d at 125. Whether the surrounding circumstances of an out-of-court statement possess sufficient guaranties of trustworthiness is a question of law. *State v. Salazar,* 504 N.W.2d 774, 776–77 (Minn.1993).

"[T]he focus is not on all the circumstances, including evidence at trial corroborating the child's statements, but only on those circumstances actually surrounding the making of the statements. These circumstances include, but are not limited to,

whether the statements were spontaneous, whether the person talking with the child had a preconceived idea of what the child should say, whether the statements were in response to leading or suggestive questions, whether the child had any apparent motive to fabricate, and whether the statements are the type of statements one would expect a child of that age to fabricate."

*Larson II,* 472 N.W.2d at 125 (quoting *State v. Lanam,* 459 N.W.2d 656, 661 (Minn.1990)) (citing *Idaho v. Wright,* 497 U.S. 805, 820–825, 110 S.Ct. 3139, 3149–52, 111 L.Ed.2d 638 (1990))

Other circumstances identified by the Court in *Wright* include the "mental state" of the child at the time the statements were made and the "consistent repetition" of the child's statements during the same interview or conversation."

*Id.* at 125–26.

■■ The district court found that K.H.'s interview with Weigman had the following guaranties of reliability: Weigman had extensive training and experience in child sex abuse matters; the interview was conducted with drawings, diagrams, and anatomically correct dolls; Weigman used nonleading and open-ended questions; K.H. described the sexual abuse both verbally and using anatomically correct dolls; K.H. demonstrated extensive sexual knowledge for a four-year-old; K.H.'s statements were consistent; the interview was relatively close in time, within two months, to the acts of abuse; and K.H. did not agree with everything Weigman said. The district court also noted K.H.'s illnesses and the consistency in her statements as corroborative evidence of sexual abuse.

We conclude that the guaranties of reliability found by the district court were sufficient to satisfy the trustworthiness requirement of Minn. R. Evid. 803(24). The record shows that the remaining criteria for admissibility under rule 803(24) also were satisfied. The district court did not abuse its discretion in admitting into evidence K.H.'s interview with Weigman. In light of our conclusion that the interview was admissible under rule 803(24), we do not reach the issue of whether its

admission violated Minn.Stat. § 595.02, subd. 3.

### Confrontation Clause

 Both the federal and state constitutions grant a criminal defendant the right to confront the witnesses against him. U.S. Const. amend. VI; Minn. Const. art. I, § 6. In *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980), the Supreme Court set forth a general approach for determining when statements admissible under an exception to the hearsay rule meet the requirements of the Confrontation Clause. Under that approach, the prosecution "must either produce, or demonstrate the unavailability of, the declarant" and must demonstrate that the statement has adequate "indicia of reliability." *Id.* 65–66, 100 S.Ct. at 2538–39. In *United States v. Inadi,* 475 U.S. 387, 391, 399–400, 106 S.Ct. 1121, 1124, 1128, 89 L.Ed.2d 390 (1986), the Supreme Court created an exception to the general approach and held that the Confrontation Clause of the United States Constitution did not require a showing of unavailability for the out-of-court statement of a co-conspirator who did not testify at trial to be admitted into evidence.

 The Minnesota Supreme Court has indicated that *Inadi* applies to out-of-court statements by child sex-abuse victims. *Larson II,* 472 N.W.2d at 123–25 n. 1. The *Larson II* court adopted the requirement that the state must,

> when *expressly* requested by the defendant to do so, call in its case-in-chief an available witness whose hearsay statements are being admitted against the defendant.

*Id.* at 124 n. 1. Under the analysis set forth in *Larson II,* 472 N.W.2d at 123–26 n. 1, the Confrontation Clause does not require a finding of unavailability before an out-of-court statement by a child sex-abuse victim may be admitted into evidence. Instead, the burden is on the defendant to request that the child-victim be called as a witness. *Id.* Hollander did not request that K.H. be called as a witness.

 Hollander argues that this case is distinguishable from *Larson II* because, in *Larson II,* the district court had conducted a competency hearing and found the child-victim competent to testify. Requiring the district court to conduct a competency hearing when neither party intends to call the child-victim as a witness serves no purpose. Under *Larson II,* the child-victim is not required to testify even if she is competent. If the child-victim is incompetent to testify, the Confrontation Clause's unavailability requirement is satisfied. *See State v. Oslund,* 469 N.W.2d 489, 493 (Minn.App.1991) ("unavailability of a witness for confrontation clause purposes can be established when the prosecution produces a witness for a competency hearing and the witness is found incompetent to testify at trial"), *review denied* (Minn. July 24, 1991). A child-victim's competency, thus, does not affect the Confrontation Clause analysis absent a request by the defendant to call the child-victim as a witness, and no competency hearing is required absent such a request.

Hollander also argues that the *Larson II* rule was limited by the Supreme Court's later decision in *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). The *White* Court held that the prosecution was not required to produce the child-victim of a sexual assault at trial or have the district court find her unavailable to testify as a condition for admitting her out-of-court statement when the statement was admissible under the spontaneous declaration and medical examination exceptions to the hearsay rule. *Id.* at 356–57, 112 S.Ct. at 742–43. The Court explained:

> A statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom. Similarly, a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony. They are thus materially different from the statements at issue in *Rob-*

*erts,* where the out-of-court statements sought to be introduced were themselves made in the course of a judicial proceeding, and where there was consequently no threat of lost evidentiary value if the out-of-court statements were replaced with live testimony.

The preference for live testimony in the case of statements like those offered in *Roberts* is because of the importance of cross-examination, "the greatest legal engine ever invented for the discovery of truth." Thus courts have adopted that general rule prohibiting the receipt of hearsay evidence. But where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.

We therefore think it clear that the out-of-court statements admitted in this case had substantial probative value, value that could not be duplicated simply by the declarant later testifying in court. To exclude such probative statements under the strictures of the Confrontation Clause would be the height of wrongheadedness, given that the Confrontation Clause has as a basic purpose the promotion of the " 'integrity of the factfinding process.' " And as we have also noted, a statement that qualifies for admission under a "firmly rooted" hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability. Given the evidentiary value of such statements, their reliability, and that establishing a generally applicable unavailability rule would have few practical benefits while imposing pointless litigation costs, we see no reason to treat the out-of-court statements in this case differently from those we found admissible in *Inadi.*

*Id.* (citations omitted).

■■■ Hollander argues that *White* should be construed as limiting *Inadi* to out-of-court statements that fall within a "firmly rooted" exception to the hearsay rule. The residual exception is not firmly rooted for confrontation clause purposes. *Larson II,* 472 N.W.2d at 125 (citing *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 3148–49, 111 L.Ed.2d 638 (1990)). But, because the residual exception requires statements to have "equivalent circumstantial guarantees of trustworthiness" as statements admissible under specific exceptions set forth in Minn. R. Evid. 803, we decline to construe *White* as limiting *Inadi* to firmly rooted exceptions to the hearsay rule. The district court did not err in admitting into evidence K.H.'s interview with Weigman.

## II.

■■■ Failure to make a timely objection to the admission of evidence is a bar to appeal. If the admission, however, is plain error affecting substantial rights or constituting a fundamental error of law, it may be reviewed on appeal notwithstanding the failure to object. Our test for whether an evidentiary admission rises to the level of plain error is "whether there was or was not a reasonable likelihood that any error substantially affected the verdict."

*State v. Miller,* 573 N.W.2d 661, 675 (Minn. 1998) (citations omitted). The cumulative effect of errors at trial may constitute grounds for reversal. *See State v. Underwood,* 281 N.W.2d 337, 344 (Minn.1979) (reversing based on cumulative effect of errors).

### A.

**K.H.'s statement**

■■■ The following exchange took place during Weigman's interview with K.H.:

Q. If somebody touches you there or wants to touch you or make you touch them, what—who can you tell about that?

A. I don't want him to do it to none of my friends.

Q. You don't want him to do it to any of your friends?

A. No, I got all of—all of my friends.

Q. All of your friends? Do you think daddy might have touched some of your friends?

A. Yes.

Q. Who—which friend do [you] think he touched?

A. Tasha.

Q. Tasha. Why do you think he touched Tasha?

A. Tasha is black. I mean brown.

Q. Tasha is black? Brown? Do you think daddy touched Tasha?

A. Yeah.

\* \* \* \*

Q. \* \* \* Have you ever seen daddy touch anybody else's body parts? .

A. Nope.

Even if this part of K.H.'s statement should have been excluded, admitting it was not plain error. K.H.'s reason for thinking Hollander had touched her friend, because Tasha was black or brown, was illogical. K.H. said she had never seen Hollander touch anybody else's body parts. This evidence was not referred to again during trial, and there were no other allegations that Hollander might have abused anyone other than K.H.

### B.

**J.D.'s testimony**

█ J.D. testified:

He called me and, um, we were talking and joking around and, um, he told me that I should be proud of him because he started his first epidemic, um, that he knew of. I don't remember the exact number, something like twenty people or something like that had chlamydia.

The testimony that Hollander bragged about starting a chlamydia epidemic was an isolated occurrence and was not referred to again during trial. Any error in admitting the evidence did not rise to the level of plain error. Moreover, Hollander attempted to use the fact that he had chlamydia to his advantage because K.H. had not contracted the disease.

### C.

**Weigman's opinion**

█ Finally, Hollander objects to the admission of Weigman's opinion that Hollander sexually abused K.H. Hollander concedes that as a licensed social worker and child interview specialist, Weigman was qualified

to opine that K.H.'s allegations supported a finding of sexual abuse. *See State v. Dana,* 422 N.W.2d 246, 250–51 (Minn.1988) ("Expert testimony relating to whether the children had been sexually abused was properly admitted.") But opinion testimony on the issue of who it was who committed the sexual abuse is not proper. *Id.* at 250. The *Dana* court found that the error in admitting the expert testimony on identity was not prejudicial because the issue in dispute was whether the children had been sexually abused, not who did it. *Id.*

█ Here, as in *Dana*, . the question was whether K.H. had been sexually abused. There was no allegation that anyone other than Hollander might have committed the abuse. Although, during the interview with Weigman, while describing the sexual abuse, K.H. said that she had "two daddies" and identified her other daddy as grandpa, K.H.'s stepgrandfather was gone when K.H. stayed with her paternal grandmother. Also, J.D. dated a man for about two months beginning on Thanksgiving 1996. But J.D. testified that her boyfriend was never alone with K.H. and that K.H. never indicated that anyone other than Hollander had sexually abused her. The error in allowing expert testimony on identity was not prejudicial.

Even considering the cumulative effect of the claimed errors, there was not a reasonable likelihood that they substantially affected the verdict.

### DECISION

The district court did not err in admitting into evidence K.H.'s interview with Weigman. The cumulative effect of the remaining claimed evidentiary errors did not constitute plain error.

**Affirmed.**