**In the Matter of the WELFARE OF L.E.P., Juvenile.**

No. C–3–98–268.

Supreme Court of Minnesota.

May 6, 1999.

Michael A. Hatch, Atty. Gen., St. Paul, Thomas J. Harbinson, Scott County Atty., Susan K. McNellis, Asst. County Atty., Shakopee, for appellant.

John M. Stuart, State Public Defender, Rick E. Mattox, Asst. First Judicial Public Defender, Prior Lake, for respondent.

## OPINION

STRINGER, J.

L.E.P. was charged as a juvenile with first-degree criminal sexual conduct in violation of Minn.Stat. § 609.342, subds. 1(a) and 2 (1998) for allegedly engaging in criminal sexual conduct with his 7–year-old cousin, K.M.P. on August 9, 1997. The state moved to admit a videotaped statement made by K.M.P. to a nurse practitioner on August 18, 1997 under Minn.Stat. § 595.02, subd. 3 (1998) (admitting statements of child about sexual abuse), Minn. R. Evid. 803(4) (hearsay exception for statements made for purposes of medical diagnosis or treatment), or Minn. R. Evid. 803(24) (residual hearsay exception). Following a pretrial hearing the trial court denied the state's motion and suppressed the videotape holding that the medical treatment exception did not apply and that·

the videotape lacked sufficient indicia of reliability for purposes of admissibility under the statute or the residual hearsay exception. On the state's appeal the court of appeals affirmed the trial court, holding that the state had not met its burden of showing that suppression would have a critical impact on the state's case and thus the court did not reach the merits of the suppression order. *In re Welfare of L.E.P.*, No. C3–98–268, 1998 WL 405035, *1 (Minn.App. July 21, 1998). We reverse, holding that the critical impact threshold of review was met and the trial court erred in suppressing the videotape.

In July of 1997, 7–year–old K.M.P. went on a two-day camping trip with her 14–year–old sister K.C.P., her aunt, and her aunt's three children, including 17–year–old L.E.P. The group went horseback riding together during the day and at night the campers slept in the aunt's motorhome. On the second evening K.M.P. whispered to her sister that L.E.P. had "touched her peepee." K.C.P did not ask any questions about what K.M.P. meant, but told K.M.P. that they would have to tell their mother.

Approximately a week later K.C.P. told her mother that K.M.P. "had some things to talk to her about." K.M.P. initially refused to talk stating that L.E.P. "would be mad at her" and "wouldn't like her anymore," but K.M.P. did eventually tell her mother that L.E.P. exposed himself to her in the motorhome. K.M.P.'s mother did not at that time ask any questions to clarify what exactly had happened, but later that same day she talked to her husband about what K.M.P. had told her. They decided to keep K.M.P. and L.E.P. apart but to do nothing more because "the family situation [was] rather tense." K.M.P. was angry when her mother told her to stay away from L.E.P. because she liked him and liked to visit his family's farm.

On August 9, 1997 a second alleged assault took place—the assault for which L.E.P. is charged—when K.M.P. and L.E.P. attended a wedding reception with their families near Jordan, Minnesota. At approximately 9:45 p.m. K.M.P.'s mother left the reception and went to the 30–foot motorhome where she and K.M.P. had been staying to get some cassette tapes. As she went to the front of the motorhome she heard a noise and turned to see K.M.P. next to the beds at the back of the motorhome pulling down her shirt and looking scared. L.E.P.'s shoes were on the floor next to a bed. K.M.P.'s mother asked her who was with her and K.M.P. responded that it was L.E.P. When L.E.P. identified himself, K.M.P.'s mother told him to put on his shoes and get out.

After L.E.P. left, K.M.P. told her mother that L.E.P. had kissed her on the cheeks and "boobs" but denied that anything else had happened. On the following Tuesday evening however, K.M.P. spontaneously revealed to her mother that L.E.P. had "put his peepee between her legs" while her underwear and pants were down and K.M.P. pulled her legs apart to demonstrate. K.M.P. told her mother that she hadn't told her earlier because "I didn't want [L.E.P.] to be mad at me." K.M.P. repeated the same story to her mother the following night. On Thursday, August 14, K.M.P's mother reported the incident to the police. Following her report, the Scott County Sheriff's Department contacted Midwest Children's Resource Center (MCRC), a medical clinic of Children's Hospital and a regional center for the medical examinations of children with alleged physical and sexual abuse concerns, to make arrangements for an examination of K.M.P.

On Monday, August 18, K.M.P. was taken by her mother to MCRC for the examination. K.M.P.'s mother testified at the omnibus hearing that she explained to K.M.P. that she needed to talk to a nurse about what had happened with L.E.P. K.M.P. was examined by Mary Mackenburg, an experienced certified pediatric nurse practitioner who had performed approximately 86 examinations of children

believed to be the victims of child abuse. Mackenburg followed MCRC protocol for the examination, including an initial interview with the child followed by a physical exam. At the omnibus hearing Mackenburg testified that the purpose of the interview was "to discuss with [the child] their allegations of physical or sexual abuse," and the purpose of the physical exam was "to rule out any physical injuries or medical problems."

Mackenburg began by speaking to K.M.P.'s mother alone for several minutes about K.M.P.'s health history and how the concern came to her attention. She then met with K.M.P. alone in an examination room. The entire interview and physical exam were audio-taped but only the interview was visually recorded; the physical exam took place in another part of the exam room where the voices of K.M.P., Mackenburg, and K.M.P.'s mother can be heard but their images cannot be seen on the videotape.

The videotape was played at the omnibus hearing. After a few minutes of conversational questions, Mackenburg talked to K.M.P. about the difference between truth and falsity and said that she was going to talk with K.M.P. about "things that are true and really happened. Okay?" K.M.P. replied, "Okay." Mackenburg showed K.M.P. anatomically correct drawings of a boy and girl and had her name the body parts. K.M.P. correctly identified "nipples" and "butt" on both the girl and boy drawings and identified the girl's genitalia as a "private" and the boy's as a "weiner." When K.M.P. denied ever seeing a boy's "weiner," Mackenburg remarked that K.M.P.'s mom "told me that she thought maybe something happened with your cousin [L.E.P.]?" K.M.P. replied, "Um, well, I saw his weiner."

Q [Mackenburg]: Where were you when you saw his weiner?

A. [K.M.P.] Um—he um—when we were at my cousin Heidi's house, you know, he was right behind me and he pushed me into the moto-

rhome and then he laid—I said, no, I don't want to lay on the bed. And he said, yes, lay on the bed. And I said, no. Then he laid me on the bed, you know, and he took my shoes off and he pulled down my pants and put his weiner in between my legs.

Q. He did?

A. Uh-huh.

Q. Did he pull down your underpants too?

A. Yeah. And he pulled down his pants too.

Q. And he pulled down his pants.

A. Too.

Q. Okay. So did you see his weiner?

A. Yeah.

Q. Okay. And he put his weiner between your legs?

A. Right in here in my peepee. (demonstrating)

Q. In your peepee. How did that make your peepee feel?

A. It hurts.

Q. It hurts. Does it still hurt now?

A. Huh-uh. (no)

Q. Okay. How did it make your feelings feel?

A. Feeling really, um, sad, you know.

Q. Make you sad?

A. Yeah. But I know, um—I told him to get off me but he didn't. And I said "are you done yet" and he said "almost." And he didn't get off me.

When asked, K.M.P. willingly demonstrated how L.E.P. had laid on top of her and "moved his butt up and down." She volunteered that L.E.P. had kissed her on her neck and "boobs" and "on my peepee too." Mackenburg asked if anything came out of L.E.P.'s "weiner" and K.M.P. said yes, some "white thing" which got on the bed and made the bed "a little bit" wet. Mackenburg then asked if K.M.P. had seen L.E.P.'s "weiner" before that day and K.M.P. answered "Well, yeah." She stat-

ed that when she was still in first grade L.E.P. had carried her into a shed on his family's farm and did "the same thing." K.M.P. then denied remembering any more details and Mackenburg did not press her.

Upon completion of the interview, K.M.P. moved to an examining table and the physical exam began. K.M.P.'s demeanor changed as she began to worry about whether the genital examination would hurt. K.M.P. became increasingly anxious and upset, often crying and whimpering even though Mackenburg showed K.M.P. the coloposcopic camera she would use and demonstrated that the machine would not touch or hurt her. K.M.P. did however separate her labia and point to her perineum and mucus membranes when asked to show where L.E.P. had touched her. Mackenburg was unable to complete the coloposcopic exam but a visual examination of K.M.P.'s genitalia did not disclose any injuries.

While Mackenburg was attempting to complete the genital exam, K.M.P. denied several times that L.E.P. had hurt her:

Q. That's what we're gonna look for, to make sure that when [L.E.P.] touched your bottom he didn't hurt you at all.

A. He didn't hurt me or anything, he just—

* * * *

Q. Sometimes when big boys touch little girls with their weiners their bodies get hurt, and that's what I want to look to make sure your body didn't get hurt. We just want you to be healthy.

A. It didn't.

Q. Well, I know. But you told me that it hurt when he touched you. Didn't your peepee hurt?

A. No.

* * * *

[Mother]: [S]he wants to make sure that [L.E.P.] didn't hurt you.

K.M.P.: He didn't. He didn't hurt me.

[Mother]: But she wants to make sure, sweetie. Sweetie, she just wants to make sure.

K.M.P.: I'm sure. He didn't do anything to me. I'm sure.

[Mother]: Huh.

K.M.P.: I'm sure. He didn't do anything to me.

[Mother]: Well, she has to find that out so that—(videotape ends).

The last assertion that L.E.P. "didn't do anything" to her came after Mackenburg had asked K.M.P.'s mother to enter the room in an attempt to comfort K.M.P. Mackenburg testified at the omnibus hearing that after she left K.M.P. alone with her mother she decided that "it wasn't worth traumatizing the child any further and I turned off the video equipment from outside of the room." After the exam K.M.P.'s mother testified that her daughter was angry "[b]ecause that lady wanted to touch her peepee." K.M.P.'s mother told Mackenburg that K.M.P.'s reaction to the physical exam was not a typical response for her.

Mackenburg discussed K.M.P.'s interview with her supervising physician Dr. Carolyn Levitt and both agreed that there was "a strong disclosure of sexual contact" with L.E.P. Mackenburg testified that the lack of physical evidence did not affect their medical opinion because "approximately three quarters of all children [who have been abused] don't have any physical evidence" and genital evidence of abuse is particularly unusual in girls. K.M.P.'s denials that L.E.P. had hurt her were explained by Mackenburg as an attempt to avoid the physical exam and she testified that reluctance to complete the physical exam is more common in female children who have experienced genital trauma. Mackenburg's report detailing the interview and examination was forwarded to Carver County Social Services and the Scott County Sheriff's Department and it was admitted in evidence at the omnibus hearing.

The trial court ruled that the statements made by K.M.P. to her mother and sister were admissible but the videotape of Mackenburg's interview and examination was not. The court held that Mackenburg employed questionable tactics and used leading and suggestive questions in the interview and that the resulting statement was insufficiently reliable. The court further held that the hearsay exception for statements made for medical diagnosis was inapplicable because no medical history was compiled and no follow-up was performed.

On appeal, the state argued that the trial court erred in suppressing the videotape and that the error would have a critical impact on a successful prosecution of L.E.P. *See.L.E.P.,* 1998 WL 405035, at *1. The court of appeals disagreed however, holding there was no critical impact because the videotape was both inculpatory and exculpatory of L.E.P., thus diminishing the impact of the suppression. *Id.* The court of appeals also held the state's concern regarding critical impact was "entirely speculative" since there was "no evidence that [K.M.P.] will not testify or that her testimony will not be consistent with her prior statements." *Id.*

## I.

■ We first address the threshold issue in the state's pretrial appeal under Minn. R. Juv. P. 21.04, subd. 1 of whether the state has clearly and unequivocally demonstrated that the suppression ruling will have a critical impact on the outcome of the trial. *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977). In the absence of critical impact we will not review a pretrial order. *State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998); *State v. Edrozo,* 578 N.W.2d 719, 722–23 (Minn.1998).

■ Critical impact is met when the suppression of the evidence significantly reduces the likelihood of a successful prosecution. *State v. Joon Kyu Kim,* 398 N.W.2d 544, 551 (Minn.1987). The state is not required to show that conviction is

impossible without the suppressed evidence—only that success of the prosecution will be seriously jeopardized. *Id.* (citing IV ABA Standards for Criminal Justice, Criminal Appeals 21–1.4(a)(iii) (2d ed.1980)).

■ When analyzing critical impact, an appellate court should first examine all the admissible evidence available to the state in order to determine what impact the absence of the suppressed evidence will have. *State v. Zanter,* 535 N.W.2d 624, 630–31 (Minn.1995). The analysis should not stop there however. The court should go on to examine the inherent qualities of the suppressed evidence itself, its relevance and probative force, *see Edrozo,* 578 N.W.2d at 723, its chronological proximity to the alleged crime, its effect in filling gaps in the evidence viewed as a whole, its quality as a perspective of events different than those otherwise available, its clarity and amount of detail and its origin. Suppressed evidence particularly unique in nature and quality is more likely to meet the critical impact test. *See Edrozo,* 578 N.W.2d at 723 (finding taped conversation regarding defendant's state of mind to have critical impact to prosecution of a specific-intent crime despite significant amount of forensic and eyewitness evidence). We have held that when a young child is found incompetent to testify and is thus unavailable the suppression of the child's statements describing the alleged sexual abuse reduces the likelihood of a successful prosecution and meets the critical impact test. *State v. Lanam,* 459 N.W.2d 656, 659 (Minn.1990) *cert. denied,* 498 U.S. 1033, 111 S.Ct. 693, 112 L.Ed.2d 684 (1991) (holding that incompetent child is unavailable for purposes of hearsay exception); *State v. Edwards,* 485 N.W.2d 911, 913–14 (Minn.1992) (holding that suppression of incompetent child's statements describing abuse meets critical impact test).

■ L.E.P. argues that suppression of the videotape does not have a critical im-

pact on the state's case because the trial court ruled that the statements made to K.M.P.'s mother and sister are admissible, the videotape contains major inconsistencies, and there is no showing that K.M.P. will not testify and give identical testimony. The state responds that the videotape is the best and most reliable evidence and would allow the trier of fact an unparalleled opportunity to judge the child's credibility and demeanor.

We agree with the state that the videotape offers an account of the events of the offense charged for which the testimony of others who were not the victim can be no substitute. It was recorded within a few days of the alleged abuse and gives the jury a unique opportunity to observe K.M.P. in a setting free of the stress of the courtroom. While it is true that K.M.P.'s description of the pain L.E.P. allegedly inflicted on her was later denied when she wanted to end the examination, her fear of being subjected to even more pain from the examination readily explains the inconsistency and the probative value of the videotape is not diminished because of it.

The lack of certainty about whether K.M.P. will testify and what her testimony will be if she does testify should not, under the circumstances here, stand in the way of our reaching a conclusion as to critical impact. If K.M.P. does not testify the suppression of the videotape clearly meets the critical impact test under *Edwards*. If K.M.P. testifies but denies the abuse took place, the videotape is probative of her truthfulness on this point as it is important evidence as to whether an assault took place and her motive for changing her story. If K.M.P. does testify and is consistent with her interview on the videotape she will of course be available for cross examination.

We therefore hold that the state has met the critical impact test by clearly and unequivocally demonstrating that the sup-

pression of the videotape will significantly reduce the likelihood of a successful prosecution.

## II.

We next determine whether the trial court erred in suppressing the videotape evidence. The state argues that the videotape is admissible as evidence under (1) the evidentiary rule exception to the inadmissibility of hearsay where the statements are for the purpose of medical diagnosis and treatment, Minn. R. Evid. 803(4); (2) the residual hearsay exception, Minn. R. Evid. 803(24); and (3) as a statement of a child under age 10 regarding sexual abuse pursuant to Minn.Stat. § 595.02, subd. 3. Because we find the videotape admissible under Minn.Stat. § 595.02, subd. 3, we do not address its admissibility under the hearsay exceptions.

In response to increased awareness of sexual abuse of children,[1] the Minnesota Legislature established a statutory scheme for the evaluation of the admissibility of statements made by children regarding sexual abuse. Minn.Stat. § 595.02, subd. 3 provides:

> An out-of-court statement made by a child under the age of ten years * * * alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child * * * not otherwise admissible by statute or rule of evidence, is admissible as substantive evidence if:
>
> (a) the court or person authorized to receive evidence finds, in a hearing conducted outside of the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and
>
> (b) the child * * * either:
>
> (i) testifies at the proceedings; or

---

1. *See* Note, *Minnesota's Hearsay Exception for Child Victims of Sexual Abuse*, 11 Wm. Mitchell L.Rev. 799, 799–800 (1985) (discussing increasing number of reported incidents of child sexual abuse).

(ii) is unavailable as a witness and there is corroborative evidence of the act; and

(c) the proponent of the statement notifies the adverse party * * *.

For purposes of this subdivision, an out-of-court statement includes video, audio, or other recorded statements. An unavailable witness includes an incompetent witness.

Thus the primary concern of admissibility under the statute is the reliability of the child's statements, and what considerations should guide us in evaluating reliability.

The United States Supreme Court has acknowledged that evaluating the reliability of out-of-court statements of young children regarding sexual abuse involves special considerations. In *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), statements made by a 2½-year-old girl to a pediatrician regarding sexual abuse by the child's mother and the mother's boyfriend were admitted at trial under Idaho's residual or catch-all hearsay exception. *Id.* at 811–12, 110 S.Ct. 3139. On appeal of the conviction, the child's mother argued that the admission of the statements violated her rights under the Sixth Amendment's Confrontation Clause. The Idaho Supreme Court agreed and reversed the conviction ruling that the statements fell outside traditional or firmly-rooted hearsay exceptions and were elicited in an interview which "lacked procedural safeguards" because it had not been recorded, and the pediatrician used leading questions and had a preconceived notion about what the child would say. *Id.* at 812–13, 110 S.Ct. 3139. The Supreme Court affirmed, holding that the key to protecting a defendant's Sixth Amendment rights against an unavailable witness was to ensure reliability of the statements. *See id.* at 816, 110 S.Ct. 3139 (stating that the "crux of the question" is whether evidence "bore sufficient indicia of reliability").

The Supreme Court agreed with the Idaho court that the child's statements lacked sufficient guarantees of trustworthiness for admissibility, but "decline[d] to read into the Confrontation Clause a preconceived and artificial litmus test for the procedural propriety of professional interviews in which children make hearsay statements against a defendant." *Id.* at 819, 110 S.Ct. 3139. Instead of relying upon procedural safeguards, the Court held the statements must be measured by the logic behind the firmly-rooted hearsay exceptions: that under the totality of the circumstances the declarant was particularly likely to be truthful and as a result the statements are "so trustworthy that adversarial testing [through cross-examination] would add little to [their] reliability." *Id.* at 821, 110 S.Ct. 3139. Among the factors to be considered are spontaneity, consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *Id.* at 821–22, 110 S.Ct. 3139 (citing cases). The Court noted that lower courts have "considerable leeway in their consideration of appropriate factors" as long as the factors considered relate to whether the child was particularly likely to be truthful. *Id.* at 822, 110 S.Ct. 3139.

Minnesota courts have articulated a number of additional factors to consider in evaluating the reliability of out-of-court statements by young children including "the knowledge of the declarant, the motives of the declarant and witnesses to speak truthfully and the proximity in time between the statement and the events described." *State v. Conklin,* 444 N.W.2d 268, 276 (Minn.1989); *see also State v. Larson,* 472 N.W.2d 120, 127 (Minn.1991), *cert. denied,* 502 U.S. 1071, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). Other relevant factors include whether the person talking with the child had a preconceived idea of what the child would say and the lack of leading or suggestive questions. *Lanam,* 459 N.W.2d at 661.

These criteria have been used to analyze the reliability of statements by young chil-

dren admitted under Minn. R. Evid. 803(24), the residual hearsay exception. We held that statements made by a 7–year–old victim to a police officer at a hospital were· found admissible under the residual hearsay exception. *Edwards,* 485 N.W.2d at 916–17. The statements in *Edwards* were sufficiently reliable because they were made approximately an hour after the assault, the child was extremely frightened and upset, the officer had no preconceived notion about what the child would say, the child had no apparent motive to fabricate, the statements were· not of a type which a child of that age would be expected to fabricate and the statements were internally consistent during the interview. *Id.* at 912–13, 916. In *State v. Scott,* 501 N.W.2d 608 (Minn.1993), however, we held that statements made by a 9–year–old to a deputy were not admissible under 803(24) when the deputy used leading questions indicating that he may have had a preconceived notion about what the child would say, there was nothing in the record to indicate the child did not have a motive to fabricate, the statements were not so graphic that a child could not fabricate them and the statements were not given at a time when the child was in a moment of high anxiety. *Id.* at 619.

■ The time, content, and circumstances of the statement and the reliability of the person to whom the statement is made are the factors the court must consider in determining whether there are sufficient indicia of reliability under Minn. Stat. § 595.02, subd. 3. We held in *Larson* that statements made by a 4–year–old to a child protection specialist were admissible as sufficiently reliable under Minn.Stat. § 595.02, subd. 3 because the child appeared motivated to protect the defendant, the questions were nonleading, the child was very upset, and the statements were not the kind expected of a child that age. 472 N.W.2d at 127; *see also Lanam,* 459 N.W.2d at 661 (statements made by 3–year–old to daycare provider found reliable under Minn.Stat. § 595.02, subd. 3

because questions were not leading, the child did not have a motive to fabricate, statements were unexpected of a child that age, and statements were internally consistent). However, statements made by a child to a social worker in *Larson* were not sufficiently reliable when the questions were leading, the responses were "not particularly spontaneous," and the child's emotions appeared unaffected. 472 N.W.2d at 128.

■ Applying these various standards to the facts here, we conclude that the trial court erred in holding that K.M.P.'s statements to Mackenburg did not have sufficient indicia of reliability for admissibility under Minn.Stat. § 595.02, subd. 3. K.M.P. is clearly fond of L.E.P. and enjoys visiting his family's farm—she thus has no motive to fabricate the allegations and indeed expressed a strong desire to protect her relationship with L.E.P. She initially would not talk about the matter because she was afraid L.E.P. "would be mad at her" and "wouldn't like her any more" and was angry when her mother told her to stay away from L.E.P. because she liked him and liked to visit his family farm.

Many of the details of the alleged assault and K.M.P.'s revelation of earlier abuse were spontaneous and her story remains consistent throughout the various occasions she recounted it—first to her sister, then to her mother and finally to Mackenburg—until the genital exam. K.M.P.'s resulting anxiety about the genital exam and contemporaneous denials that L.E.P. "did anything" do not undermine the reliability of her interview because they clearly appear to have been made in an attempt to avoid a repetition of the pain she described when L.E.P. allegedly assaulted her. As to the use of unexpected terminology, "peepee" and "weiner" are terms that might be expected from a 7–year–old, but K.M.P.'s description of L.E.P.'s body movements, where he placed his "weiner" in her and his ejaculation are not. K.M.P.'s initial demeanor on the· videotape was cheerful and she seemed quite

willing to help Mackenburg understand exactly what occurred, even to the point of demonstrating certain aspects of the abuse.

We do not find Mackenburg's questions to K.M.P. particularly leading or suggestive. K.M.P. had denied seeing a boy's weiner, contrary to what K.M.P.'s mother had told Mackenburg, and Mackenburg replied that K.M.P.'s mother "told me that she thought maybe something happened with your cousin." Then followed K.M.P.'s detailed account of L.E.P.'s sexual assault. Mackenburg's reference to "maybe something happened" was certainly not so suggestive that K.M.P. would be inclined to answer in any particular way, and K.M.P.'s response describing the assault was generally spontaneous and often included details beyond the scope of Mackenburg's questions. For example, when asked where she was when she saw his weiner, K.M.P. responded with details about L.E.P. pushing her onto the bed and putting his weiner between her legs. When Mackenburg asked if L.E.P. pulled down her underpants and K.M.P. answered yes, she went on to say that L.E.P. pulled down his own pants too. Mackenburg employed techniques appropriate for gaining information from a 7–year–old without putting words in the child's mouth. She often repeated what K.M.P. said, as if to validate it, and asked follow-up questions about the information K.M.P. had already given her— usually open-ended questions such as "did anything else happen?" Mackenburg's interview of K.M.P., while not pristine in its open-endedness, was not at all the product of leading questions or of Mackenburg's own preconception of what K.M.P. would say. We therefore conclude that the statements meet the requirements of subdivision 3(a) of Minn.Stat. § 595.02.

### III.

We next turn to the statutory requirement for admissibility that the child must testify, or if the child is unavailable, there must be corroborative evidence of the statement's reliability. *See* Minn.Stat. § 595.02, subd. 3(b).

Considering first whether the child *must* be unavailable as a prerequisite to admitting the child's out-of-court statement for purposes of protecting a defendant's Sixth Amendment right to confront his accusers, the Supreme Court ruled in *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), that there was no *per se* rule requiring unavailability and rejected the defendant's arguments that the failure of the prosecution to produce the available witness violated his Sixth Amendment right to confront his accusers. *Id.* at 392–94, 106 S.Ct. 1121. In so holding, the Court distinguished prior statements made by co-conspirators from prior testimony of a witness held inadmissible in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980):

> [C]o-conspirator statements derive much of their value from the fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence. Under these circumstances, "only clear folly would dictate an across-the-board policy of doing without" such statements. * * * The admission of co-conspirators' declarations into evidence thus actually furthers the "Confrontation Clause's very mission" which is to "advance 'the accuracy of the truth-determining process in criminal trials.'"

*Inadi,* 475 U.S. at 395–96, 106 S.Ct. 1121 (citations omitted). While obviously K.M.P.'s videotaped testimony is not that of a co-conspirator, the same considerations of reliability apply and the testimony is equally "irreplaceable as substantive evidence." *See id.* at 396, 106 S.Ct. 1121.

K.M.P. may or may not be available to testify. If she is available and is called by the state as a witness, the videotape is properly admitted since it exhibits sufficient indicia of reliability, *see Wright,* 497 U.S. at 814–15, 110 S.Ct. 3139, and appellant's Sixth Amendment rights are satisfied by his ability to cross-examine her, *see Maryland v. Craig,* 497 U.S. 836, 846, 110

S.Ct. 3157, 111 L.Ed.2d 666 (1990). If K.M.P. is available but neither the state nor appellant wishes to call her as a witness, the videotape may be admitted since it has sufficient indicia of reliability and is not a weaker substitute for live testimony but derives its significance from the circumstances under which it was made. *See Inadi*, 475 U.S. at 395–96, 106 S.Ct. 1121.

If K.M.P. is unavailable as a witness, Minn.Stat. § 595.02, subd. 3(b) requires corroborative evidence of the conduct charged. K.M.P.'s account of the abuse has remained consistent over time, the videotaped statement is corroborated by the testimony of her mother, her sister and Mackenburg, and taken together, the evidence interlocks to create a single consistent and cohesive account of the alleged assault.

In summary, we hold that the state has met its burden of demonstrating that the suppression of the videotape will have a critical impact on its case and that the videotape is admissible under Minn.Stat. § 595.02, subd. 3. The circumstances surrounding the making of the videotape, including lack of motive to fabricate, spontaneity and demeanor, expressions unexpected from a child of K.M.P.'s age and the absence of leading questions provide sufficient indicia of the reliability of the statement. Subdivision 3(a) of the statute is therefore met. Subdivision 3(b) is satisfied whether or not K.M.P. is available to testify because appellant can cross-examine K.M.P. if she is available, and if she is not, there is sufficient corroborative evidence to ensure the reliability of the statement. Finally, there is no dispute that appellant was given notice that the state intended to offer the videotape as evidence, as required by Minn.Stat. § 595.02, subd. 3(c).

We reverse the court of appeals and the trial court's suppression order, and remand the matter for trial.