**STATE of Minnesota, Appellant,**

v.

**James Douglas McLEOD, Respondent.**

No. A04–2404.

Supreme Court of Minnesota.

Nov. 17, 2005.

---

778

Mike Hatch, Attorney General, St. Paul, MN, Robert D. Goodell, Special Assistant Hennepin County, Anoka, MN, for Appellant.

William J. Mauzy, Amos Cohen, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Respondent James Douglas McLeod, a pediatrician for 30 years, was charged by single complaint with three counts of criminal sexual conduct arising out of incidents of alleged sexual abuse against Child A and an incident of alleged sexual abuse against Child B. The alleged abuse against Child A began only six days after the alleged abuse of Child B. Both children, who were teenage male patients of McLeod, came forward independently to complain of sexual abuse that had occurred when their parents were out of the examination room. For the alleged incidents of abuse against Child A, McLeod was charged with one count of criminal sexual conduct in the first degree, Minn.Stat. § 609.342, subd. 1(b) (2004), and one count of criminal sexual conduct in the second degree, Minn.Stat. § 609.343, subd. 1(b)

(2004). For the alleged incident of abuse against Child B, McLeod was charged with one count of criminal sexual conduct in the second degree. *Id.* On motion by McLeod, the district court severed the charges relating to Child A from the charge relating to Child B.

After the district court severed the charges relating to the two teenage patients, the state moved to introduce evidence of the alleged sexual abuse against Child B as *Spreigl* evidence[1] in the trial pending on the charges of criminal sexual conduct against Child A. The district court denied the state's *Spreigl* motion, determining that there was not clear and convincing evidence that McLeod acted toward Child B with sexual or aggressive intent, a requisite element for criminal sexual conduct in the second degree, the crime McLeod allegedly committed against Child B. The state appealed from the pretrial order under Minn. R.Crim. P. 28.04, subd. 2. Before the court of appeals received the *Spreigl* hearing transcript, it dismissed the pretrial appeal, concluding that the state had failed to make the requisite threshold showing that exclusion of the evidence would have a critical impact on the pending trial. We conclude that exclusion of the *Spreigl* evidence would have a critical impact on the pending trial and that the district court's *Spreigl* ruling was in error, and we reverse and remand to the district court for further proceedings.

### Child A

In 2003, Child A's therapist reported to the police Child A's allegations of criminal sexual conduct by McLeod, which the state claims occurred when Child A was between 13 and 15 years old. According to the criminal complaint, Child A claimed that the sexual abuse began during a medical examination on August 15, 2001. McLeod told Child A to remove all of his clothes for a physical exam and then, after touching Child A's penis, McLeod "put his mouth on [Child A's] penis and performed oral sex on him." Then, McLeod allegedly told Child A that what happened should be kept between the two of them. The complaint against McLeod further alleges that on approximately seven or eight occasions between August 2001 and the summer of 2003, McLeod "would masturbate [Child A's] penis, perform oral sex on him, or both."

### Child B

The state's allegations regarding Child B arise from a single medical appointment with McLeod on August 9, 2001, when Child B was 15 years old. Previously, at his annual checkup in June, Child B had mentioned to McLeod that he had difficulty retracting his foreskin when he had an erection. At the June appointment, McLeod recommended that Child B try to stretch the foreskin and said that he would check back at their next appointment to see if there was any improvement. At the August 9 appointment, Child B, Child B's mother, and McLeod first discussed Child B's Attention Deficit Disorder (ADD). Then McLeod told Child B's mother to leave the examination room. McLeod and Child B were alone. McLeod then asked Child B about his foreskin problem and Child B told him that the stretching treatment was not helping. McLeod told Child B that he wanted to see the problem for himself.

---

**1.** *Spreigl* evidence is "[e]vidence of another crime, wrong, or act [that] is not admissible to prove the character of a person in order to show action in conformity therewith[, but which] may * * * be admissible for other purposes, such as proof of motive, opportuni-ty, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b); *see also State v. Spreigl*, 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965).

Child B's report of what happened next differs from McLeod's statement to the Health Investigations Division of the Minnesota Attorney General's Office for the Minnesota Board of Medical Practice (Medical Board). Child B stated that he got up on the examination table and McLeod instructed Child B to lay down and to lower his pants and underwear. When Child B moved to lower his pants and underwear, McLeod grabbed both articles of clothing and pulled them down himself. McLeod, without using any gloves, then pulled back Child B's foreskin a few times and asked Child B if it was painful. Child B explained that his problem was not painful but that he could not retract his foreskin when he had an erection. Child B then stated that McLeod began massaging Child B's penis in order "to get me an erection." Child B said that he told McLeod that he thought McLeod's actions were "kind of weird," but McLeod responded, "Oh, I know you're not homosexual," and told Child B that everyone has thoughts about homosexuality.

When Child B was not becoming stimulated, Child B reported that McLeod tried various other methods, including "flicking" water from the sink onto Child B's penis and telling Child B to imagine a "hot" girl with "big tits." At one point, McLeod left the examination room and came back with two packets of K–Y jelly, which McLeod applied to Child B's penis. Child B reported that, after a few more minutes, McLeod licked his fingers two or three times and continued massaging. McLeod stopped after about 10–15 minutes and told Child B to get off the table and pull up his pants. According to Child B, McLeod

said, "That's okay. We'll try again [in] 6–8 weeks though." McLeod washed his hands and they both left the examination room.

Child B quickly walked to the waiting area and sat very close to his mother. Child B's mother reported that Child B looked "flushed," was acting "different[ly]," and was very quiet. McLeod mentioned that he wanted to see Child B in 6 to 8 weeks to monitor the ADD medication. Child B's mother stated that McLeod curtly said that he wanted to see "just [Child B]"—which she found odd because she would have to drive Child B to any examination because he did not yet have his driver's license.

After they left, Child B told his mother what had happened. Child B's mother contacted other medical professionals to verify that McLeod's behavior was inappropriate in a medical examination and they instructed her to call the police. Both Child B and his mother gave statements to the police. Child B also provided the boxer shorts he had been wearing for DNA testing, but results showed DNA consistent with only one contributor, Child B. Minnesota Bureau of Criminal Apprehension forensic scientist, Kristine Deters, however, suggested that it was possible that a second DNA source could be present, but that Child B's DNA was predominant, thus blocking any other source from showing up on the tests. A doctor who had advised Child B's mother to contact the police also reported McLeod to the Medical Board.

In his statement to the Medical Board, McLeod's version of the August 9, 2001, appointment is significantly different.[2] He stated that while he did examine Child B's

---

**2.** McLeod's statement to the Medical Board is included in the record before this court. The record provides no indication of whether the district court has determined that McLeod's statement to the Medical Board will be admis-

sible at trial. We note, however, that the district court stated that it did not rely on any of McLeod's statements when it made its ruling on the admissibility of the *Spreigl* evidence related to Child B.

genitalia, it was at Child B's request for treatment of Child B's foreskin problem. He did not pull down Child B's pants, he did not attempt to give Child B an erection, he did not use water, saliva, or K–Y jelly on Child B's genitalia, and he used gloves. McLeod also denied telling Child B to fantasize about "hot" girls or that everyone gets turned on a bit by homosexual thoughts. McLeod stated that he only moved Child B's foreskin back and forth a few times and that "he spent perhaps a minute putting traction on [Child B's] penis * * * to 'simulate' an erection." McLeod did report that he asked Child B to stimulate himself so that he could get a sense of the extent of Child B's problem, which McLeod admitted "was a terrible error in judgment." He denied that he told Child B's mother that he wanted to see "just [Child B]" alone in 6 to 8 weeks.

Prior to the August 9, 2001, appointment, Child B stated that he had never had any concerns about McLeod. But he changed pediatricians after the August 2001 appointment. In 2001, Child B did not want criminal charges to be pursued against McLeod because he hoped the Medical Board would resolve the issue. The Medical Board "closed" their investigation of McLeod in July 2002, but an evaluator expressed concern that McLeod compounded his error in judgment by communicating poorly with Child B's mother and by keeping poor records. The evaluator also concluded that there had been no need for McLeod to examine Child B's problem while Child B was having an erection.

*Pretrial Spreigl motion and Spreigl hearing*

After the charges related to Child A were severed from the charge related to Child B, the state chose to prosecute the charges concerning Child A first and, by pretrial motion, sought to admit the evidence of McLeod's conduct toward Child B during the August 2001 exam as *Spreigl* evidence. At the beginning of the pretrial hearing, the district court explained that the purpose of the hearing was to determine whether "there is clear and convincing evidence of [Child B's] allegations."

*Child B's hearing testimony*

Child B's testimony at the hearing was consistent with his previous statements to the police and to the Medical Board. He also testified that he had not initially believed that McLeod's actions during the exam were sexual, but that he changed his mind when McLeod told him to fantasize about a girl at school, when McLeod did not wash his hands throughout the exam, and when McLeod dabbed his finger on his tongue. On cross-examination, Child B stated that he understood that his conversations with McLeod about his foreskin problem would be confidential, but he also stated that McLeod never told him to keep what happened a secret. McLeod did not testify at the hearing.

*Expert testimony*

McLeod called Dr. Peter Dehnel, a specialist in pediatrics. Dr. Dehnel spoke about the importance of confidentiality in a pediatrician's relationship with young patients to encourage them to disclose information on sensitive topics such as sexuality, sexually transmitted diseases, drug use, and alcohol use. He also testified that because Child B's medical problem primarily occurred when he had an erection, "it would have been extremely helpful" and "within the standard of care" for McLeod to have examined Child B with an erection.

On cross-examination, Dr. Dehnel did not explicitly say that using saliva on a patient was outside of the standard of care, but said, "I would not personally do that." When pressed by the state to say that McLeod's actions toward Child B were wrong, Dr. Dehnel said, "[i]f it leads to patient injury and if it's outside the standard of care and if it's defined under peer

review as not good practice, that would be then something that would be wrong behavior, wrong treatment."

*District court denial of motion and appeals*

The district court denied the state's *Spreigl* motion on December 7, 2004, focusing in its order on whether there was clear and convincing evidence that McLeod's acts against Child B constituted the charged offense of criminal sexual conduct in the second degree. The court concluded that there was not clear and convincing evidence that McLeod had acted "with sexual or aggressive intent." *See* Minn.Stat. § 609.341, subd. 11 (2004). The court stated that it found Child B's testimony credible "insofar as he perceived that the exam was inappropriate and that he was embarrassed by it," but stated that it was not Child B's perception of the events that matters but the evidence of McLeod's intent. The court also stated that it was "not convinced by clear and convincing evidence of the manner in which [Child B] described how [McLeod] assisted him in trying to reach an erection." Because McLeod's actions toward Child B occurred during a single examination of a medical problem brought to McLeod's attention by Child B, the court determined that the state had failed to meet its burden of establishing "that [McLeod's] actions were undertaken with sexual or aggressive intent."

Because the lack of clear and convincing evidence of McLeod's intent was dispositive for the district court, it specifically stated it was not deciding whether any of the other *Spreigl* requirements had been met. However, the court observed that *Spreigl* rulings usually occur at the end of the state's case and that Child B's allegations against McLeod were sufficiently different from Child A's allegations to very likely render them inadmissible under Minn. R. Evid. 404(b).

The state appealed the district court's pretrial ruling to the court of appeals on December 15, 2004, and ordered a transcript of the district court proceedings. Before the transcript was prepared and delivered, McLeod moved to dismiss the appeal, arguing that the court of appeals had no jurisdiction because the determination of whether a district court's alleged error has a critical impact on the outcome of a trial is a threshold jurisdictional issue and "no Minnesota holding supports the proposition that exclusion of 404(b) evidence constitutes critical impact." The state objected to McLeod's motion to dismiss, arguing that McLeod's motion was premature because the transcript had not yet been prepared, and, alternatively, that the state had met the critical impact requirements.

Before receiving a copy of the transcript, the court of appeals granted McLeod's motion to dismiss the appeal on January 6, 2005. The court concluded that the state had failed to "make a threshold showing of critical impact." The court also stated that the state "erroneously attempts to premise critical impact on future rulings 'it expects the district court will make.' "[3]

---

**3.** One of the anticipated "future rulings" involves testimony from Dr. Michael Hunter, a psychotherapist, whose testimony the state asserts is relevant to explain why Child A delayed in reporting the sexual abuse and continued to have medical appointments with McLeod after the abuse began. Hunter also testified at the *Spreigl* hearing. McLeod argues that Hunter's testimony should be excluded from trial because it does not meet the standard for admissibility under *State v. Mack*, 292 N.W.2d 764 (Minn.1980), because it would be unduly prejudicial, and because it would interfere with the jury's domain by vouching for Child A's credibility. At the hearing, Dr. Hunter testified that delayed disclosure is common among abuse victims, especially male victims. Child victims of abuse often fear that they will not be believed. Dr.

The transcript was filed with the district court on January 7, 2005.

The state petitioned to this court, asserting that the court of appeals erred when it held that the state had failed to present a record sufficient to show critical impact, and we granted review.

## I.

We must first determine whether the state has proven that the exclusion of the *Spreigl* evidence of Child B's testimony will have a critical impact on its ability to prosecute the case. Critical impact is a threshold issue and "[i]n the absence of critical impact we will not review a pretrial order." *In re L.E.P,* 594 N.W.2d 163, 168 (Minn.1999); *see also State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998) (explaining that although we had previously stated that we decide the evidentiary issue first, we changed the order in *State v. Zanter,* 535 N.W.2d 624 (Minn.1995), making critical impact a threshold issue).

When the state appeals a pretrial order, it must show clearly and unequivocally (1) that the ruling was erroneous and (2) that the order will have a "critical impact" on its ability to prosecute the case. *State v. Anderson,* 683 N.W.2d 818, 821 (Minn.2004); *State v. Richardson,* 622 N.W.2d 823, 825 (Minn.2001); *see also* Minn. R.Crim. P. 28.04, subd. 2(2). The state can show that evidence that has been excluded has a critical impact not only when excluding the evidence "completely destroys" the state's case, but also when excluding the evidence "significantly reduces the likelihood of a successful prosecution." *State v. Joon Kyu Kim,* 398 N.W.2d 544, 551 (Minn.1987). Critical impact is intended to be a "demanding standard." *Zanter,* 535 N.W.2d at 630. But excluded evidence that is "particularly

unique in nature and quality is more likely to meet the critical impact test." *L.E.P,* 594 N.W.2d at 168. "Whether [exclusion] of a particular piece of evidence will significantly reduce the likelihood of a successful prosecution depends in large part on the nature of the state's evidence against the accused." *Zanter,* 535 N.W.2d at 630.

Our decisions finding critical impact have generally involved exclusion of evidence directly relating to the charged crime. *See, e.g., Anderson,* 683 N.W.2d 818 (evidence of impaired driving relating to charges of impaired driving); *State v. Robb,* 605 N.W.2d 96 (Minn.2000) (suppressed shotgun relating to charges of felonious possession of a firearm); *Scott,* 584 N.W.2d 412 (confession). But we have not required that the excluded evidence be direct evidence of a crime to meet the requisite showing of critical impact. *See Zanter,* 535 N.W.2d at 631.

In fact, we have allowed some flexibility in determining whether excluded evidence will have a critical impact on the trial. In *Zanter,* we determined that indirect evidence in a murder case had a critical impact on a trial when we considered the state's evidence as a whole. *Id.* at 631. The state sought to introduce keys that had belonged to the murder victim and photographs of women as *Spreigl* evidence to identify Zanter as the person who had been harassing the murder victim before her death. *Id.* at 630. We said that even though the indirect evidence was not as critical to the state's case as, for example, statements of an unavailable victim or a confession of a criminal defendant, "circumstantial evidence that forms a link in the chain of the prosecution's case can be critical to the outcome of the trial because the loss of one link may prevent the state

---

Hunter also stated that "the majority of sexual abuse is covert in nature," which is made worse when an adult in a position of authority sexually abuses a child. The court did not decide if Dr. Hunter's testimony would be admissible at trial.

from meeting its evidentiary burden." *Id.* at 631. Because the case against Zanter was circumstantial, we concluded that the indirect evidence was critical to establish both Zanter's identity as the person who harassed the victim and his motive to kill. *Id.*

The state argues that the exclusion of *Spreigl* evidence has a critical impact on its ability to prosecute McLeod in the trial involving Child A. The state contends that excluding the evidence of McLeod's actions toward Child B significantly reduces the likelihood that it can successfully prosecute McLeod because Child B's testimony uniquely shows that McLeod has demonstrated a pattern of sexual abuse against teenage male patients that was closely proximate in time. In its pretrial statement, the state provided the following critical impact statement:

> The case set for trial involving Child A is a one-on-one case involving allegations of ongoing sexual abuse and a delayed report. The defense is one of fabrication. The evidence concerning Child B was sought to be admitted under the common scheme or plan exception, i.e., to establish that the act involving Child A occurred. * * * * The suppression of the evidence involving Child B will significantly reduce the likelihood of a successful prosecution.

The state lists secrecy, victim vulnerability, and the difficulty of assessing the credibility of child witnesses as among the problems the state faces in all child sex abuse cases. The state also points to its need for Child B's testimony because of potential credibility problems and sexual identity issues involving Child A and the fact that Child A continued to have appointments with McLeod after the abuse began. The state urges that Child B's testimony is necessary to rebut McLeod's defense that Child A made up the abuse or that Child A falsely remembered sexual abuse after sessions with his therapist. McLeod asserts that exclusion of *Spreigl* evidence cannot have a critical impact on a trial because no evidence in the state's case in chief is excluded.

■ To determine if the exclusion of certain evidence will have a critical impact on a trial that is pending, we first examine all of the state's admissible evidence as a whole. *L.E.P.*, 594 N.W.2d at 168; *Zanter*, 535 N.W.2d at 631. Here, the state has not delineated all of the admissible evidence because the district court has not made formal rulings on the admissibility of some of the evidence, in particular, the admissibility of expert witness opinions. The record does indicate, however, that Child A's allegations of several incidents of sexual abuse are the state's primary evidence and that McLeod's defense is that Child A has fabricated the abuse. The state's case appears to rest primarily on whether the jury believes Child A. According to the state, McLeod will attempt to show that Child A is not credible because of psychological problems, including some history of lying.

We conclude that excluding the evidence of McLeod's acts toward Child B would significantly reduce the state's chances of a successful prosecution. The incident involving Child B suggests a pattern of conduct or design that continued with Child A and is arguably sexual in nature. The state contends that McLeod's modus operandi for the acts against Child A and Child B is the same—he abused his trust and sexually abused teenage male patients when the patient's parent had left the room under the guise of a medical examination and when the child was unclothed and vulnerable.

Acts that appear to be innocent may lose their innocent nature when repeated. *See* 2 John Henry Wigmore, *Wigmore on Evidence* § 302 (Chadbourn rev.1979). In

*State v. Wermerskirchen,* we also explained that even one previous act or attempt of sexual misconduct can, when common features exist between the acts, be highly indicative of a design to commit sexual misconduct, stating:

> The committing of a single previous rape, or rape attempt, upon another woman may not in itself indicate * * * a design * * *.

> Nevertheless, a single previous act, even upon another woman, *may,* with other circumstances, give strong indication of a design (not a disposition) to rape * * *.

> Courts have shown altogether too much hesitation in receiving such evidence. Even when rigorously excluded from any bearing it may have upon character, it may carry with it great significance as to a specific design or plan of rape. There is no reason why [this evidence] should not be received when it does convey to the mind, according to the ordinary logical instincts, a clear indication of such a design.

497 N.W.2d 235, 240 (Minn.1993) (quoting 2 Wigmore, *supra* § 357) (first two omissions in original). In *Wermerskirchen,* several of the *Spreigl* acts admitted into evidence did not constitute crimes, but when viewed collectively, the acts provided evidence that the defendant's intent was criminal and that he had an ongoing pattern of opportunistic fondling of young girls. *See Wermerskirchen,* 497 N.W.2d at 242 (admitting, as *Spreigl* evidence, evidence that included the defendant smelling the victim's underwear and the defendant walking in on his niece while she was taking a bath). In other words, a series of acts inform the factfinder of the actor's intent in ways that a single act cannot.

Exclusion of Child B's testimony would make it practically impossible for the state to demonstrate a pattern of conduct or design by McLeod to abuse male teenage patients when they were alone with him in his examination room. While we cannot know all of the admissible evidence before trial, the structure of the facts and arguments is sufficiently established in this case to determine that the excluded evidence would have a critical impact at trial. Child B's testimony uniquely enables the state to show this possible pattern of conduct or design to abuse a second victim. Being able to demonstrate this pattern or design is particularly important in child sexual abuse cases where there will be problems of secrecy, victim vulnerability, the absence of physical proof of the crime, the unwillingness of some victims to testify, and a general lack of confidence in the ability of the jury to assess the credibility of child witnesses. *See id.* at 240–41. Accordingly, in this situation—a sexual abuse case where Child A's allegations are the primary evidence, Child A's credibility is affected by his delay in reporting abuse alleged to have occurred over a continuation of appointments with the alleged abuser, Child A has a reported history of psychological problems,[4] and Child B has come forward with similar allegations—we conclude that the state has met its burden of proving clearly and unequivocally that the exclusion of Child B's testimony will have a critical impact on its ability to prosecute McLeod in the trial involving McLeod's alleged acts against Child A. Though this conclusion to some degree anticipates the future course of a trial yet to occur, such anticipation is well-founded given the case record presently before this court. The determination of the critical impact of evidence upon a trial yet to occur is, by its nature, forward-looking. We conclude that the court of appeals erred when

---

4. Child A's history of psychological problems is established even aside from Child A's disclosure to his therapist, the admissibility of which has yet to be determined.

it granted McLeod's motion to dismiss the appeal. We hold that exclusion of the *Spreigl* evidence has a critical impact on the pending trial when exclusion of the evidence significantly reduces the likelihood that the state will be able to demonstrate a possible pattern of conduct or design that is sexual in nature.

## II.

■■■■ Having decided that the court of appeals erred when it concluded that the state did not show that exclusion of the *Spreigl* evidence involving Child B will have a critical impact on the trial, to avoid further delay in this pretrial appeal, we will also decide whether the district court erred when it excluded the *Spreigl* evidence. We review a district court's ruling on *Spreigl* evidence for an abuse of discretion. *State v. Blom*, 682 N.W.2d 578, 611 (Minn.2004). A decision that is "based on an erroneous view of the law" is an abuse of discretion. *State v. Storkamp*, 656 N.W.2d 539, 541 (Minn.2003).

■■■■ *Spreigl* evidence is "[e]vidence of another crime, wrong, or act [that] is not admissible to prove the character of a person in order to show action in conformity therewith[, but which] may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b); *see also State v. Spreigl*, 272 Minn. 488, 497, 139 N.W.2d 167, 173 (1965). A court can admit *Spreigl* evidence of another crime, wrong, or act only if the state meets five requirements:

(1) notice is given that the state intends to use the evidence; (2) the state clearly indicates what the evidence is being offered to prove; (3) the evidence is clear and convincing that the defendant participated in the other [crime, wrong, or act]; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5)

the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*Blom*, 682 N.W.2d at 611. But if "it is unclear whether *Spreigl* evidence should be admitted, the defendant receives the benefit of the doubt, and the evidence should be excluded." *Id.*

Our focus in this case is whether evidence of a wrong or act can constitute *Spreigl* evidence under Rule 404(b). The district court focused only on whether there was clear and convincing evidence that McLeod's actions toward Child B were committed with sexual or aggressive intent so as to constitute the crime of criminal sexual conduct in the second degree. *See* Minn.Stat. § 609.341, subd. 11. The court stated that it found Child B's testimony credible, but that the evidence of McLeod's intent was not clear and convincing. The court did not, however, determine whether there was clear and convincing evidence that McLeod's actions toward Child B were a "wrong" or "act" under Rule 404(b). In its brief, the state does not appear to contest the court's determination that McLeod's acts toward Child B did not constitute clear and convincing evidence of a crime. Rather, the state contends that the court's analysis was incomplete because the court did not consider whether McLeod's acts were also a "wrong" or "act." Because McLeod's behavior does not have to be a crime to be admissible as *Spreigl* evidence, the state asserts that the district court committed a legal error by disregarding a critical part of Rule 404(b).

■■■■ We agree with the state and hold that the district court erred when it only determined whether there was clear and convincing evidence of a crime. Rule 404(b) explicitly allows, for limited purposes, "evidence of another crime, wrong, or act." We have required that the prior

act have been a "bad" act. *See Ture v. State,* 681 N.W.2d 9, 16–17 (Minn.2004) (holding that evidence that defendant collected information on women was not admissible as *Spreigl* evidence because there is nothing inherently wrong with collecting information on women). But the prior bad act need not constitute a crime. *Angus v. State,* 695 N.W.2d 109, 122 (Minn.2005); *see also State v. Ferguson,* 581 N.W.2d 824, 834 (Minn.1998) (holding that the admission of non-crime related evidence of gang affiliation did not violate Rule 404(b) because the evidence tended to show the defendant's motive for murdering a rival gang member).

■ Therefore, it is necessary to determine whether there is clear and convincing evidence that McLeod's actions toward Child B constituted a wrong or act under Rule 404(b). To determine whether there is clear and convincing evidence, we review the district court's findings, according great deference to the district court's discretion on evidentiary findings. *State v. Profit,* 591 N.W.2d 451, 466 (Minn.1999); *see also Ture,* 681 N.W.2d at 15. If the record is sufficient for us to determine whether there is clear and convincing evidence of a wrong or act, we need not remand on this issue. The district court stated that it was "not convinced by clear and convincing evidence of the *manner* in which [Child B] described how [McLeod] assisted him in trying to reach an erection" (emphasis added), but it concluded that Child B's testimony was essentially credible and that, except for McLeod's intent, there was clear and convincing evidence for all elements of the crime of second degree criminal sexual conduct. The district court also concluded that Child B was credible when he expressed his belief that McLeod's conduct during the August 9 exam was inappropriate and that Child B was embarrassed by it. Moreover, although McLeod denies the details of the examination, he admitted to the

Medical Board that he made "a terrible error in judgment" when he asked Child B to stimulate himself during the examination.

■ We conclude that the record is sufficient to show clear and convincing evidence of a "wrong" or "act" under Rule 404(b) and we remand to the district court with instructions to complete the remainder of the *Spreigl* analysis. On remand, the district court must determine whether Child B's testimony is relevant and material and is more probative than unfairly prejudicial. The court may defer its final decision on the admissibility of the *Spreigl* evidence until the state has presented at trial all non-*Spreigl* evidence and the court can determine the need for the evidence. *State v. DeWald,* 464 N.W.2d 500, 504 (Minn.1991).

In summary, we hold that the district court erred when it concluded that the *Spreigl* evidence was inadmissible based only on its determination that there was not clear and convincing evidence that McLeod's actions toward Child B constituted a "crime." We conclude that *Spreigl* evidence may be admissible when, as here, there was clear and convincing evidence of a "wrong" or "act" under Rule 404(b) and we remand to the district court with instructions to complete the *Spreigl* analysis according to our case law, taking all relevant evidence into consideration.

### III.

■ Finally, we turn briefly to the state's arguments that the court of appeals erred by making its decision before it had received the *Spreigl* hearing transcript. To review an issue, an appellate court must have a sufficient record. *See State v. Carlson,* 281 Minn. 564, 566, 161 N.W.2d 38, 40 (1968). To provide the court with a sufficient record, Minn. R.Crim. P. 28.04, subd. 2(2), requires the state to file a

notice of appeal, a summary statement of the case with a critical impact analysis, and "a copy of the written request * * * for such transcript of the proceedings as [the state] deems necessary." But most of the requirements under Rule 28.04, subd. 2(2), including the transcript requirements, are not jurisdictional. Minn. R.Crim. P. 28.04, subd. 2(2); *cf. State v. Barrett,* 694 N.W.2d 783 (Minn.2005) (holding that failure to serve notice of appeal on the State Public Defender is a jurisdictional defect because Minn. R.Crim. P. 28.04, subd. 2(2), does not include failure to serve this notice among nonjurisdictional defects). Here, the state filed its notice, including the required critical impact statement.

We conclude that although the court of appeals erred in its analysis on critical impact, it had a sufficient record to reach a decision on critical impact. The state filed its statement of the case explaining that Child A's testimony would be the key evidence against McLeod and that Child B's testimony is necessary to show that McLeod has engaged in a pattern of criminal sexual conduct. When combined with the state's critical impact statement, the complaint and prehearing record provided sufficient information for an appellate court to determine the critical impact of excluding Child B's testimony in the pending trial involving Child A.

It would have been better if the court of appeals, before deciding critical impact, had waited to receive a transcript that had been requested, especially when, under Minn. R.Crim. P. 28.04, subd. 2(3), the due date of briefs is related to the delivery of the transcript. Although we have held that the court of appeals erred in its critical impact analysis, we conclude that the lack of a completed transcript, in this case, did not prevent an appellate court from making a determination on critical impact.

Reversed and remanded to the district court.

BLATZ, C.J., took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent. Based on the evidence in the record before us, I would hold that the state has failed to meet its heavy burden of establishing that the suppression of the Child B evidence will have a critical impact on the state's prosecution of McLeod. I would, therefore, dismiss the state's appeal.

Appeals by the state in criminal cases are not favored and "rules governing pretrial prosecution appeals are strictly construed." *State v. Barrett,* 694 N.W.2d 783, 786 (Minn.2005). In order to proceed with a pretrial appeal, the state must establish that the trial court's suppression of evidence will have a critical impact on the outcome of the trial, that is, "[t]o prevail, the state must 'clearly and unequivocally' show both that the trial court's order will have a 'critical impact' on the state's ability to prosecute the defendant successfully and that the order constituted error." *State v. Zanter,* 535 N.W.2d 624, 630 (Minn.1995). "Critical impact is met when the suppression of the evidence significantly reduces the likelihood of a successful prosecution." *In re L.E.P.,* 594 N.W.2d 163, 168 (Minn.1999). When analyzing critical impact, the reviewing court must examine all of the admissible evidence to determine the impact the excluded evidence will have on the prosecution. *Id.*

Although the court, in its opinion, identifies the correct standard for determining critical impact, the court fails to properly apply that standard in this case. The court in effect ignores the requirement that all admissible evidence be examined to determine the impact the excluded evidence will have on the prosecution. While the court acknowledges that "the state has

not delineated all of the admissible evidence because the district court has not made formal rulings on the admissibility of some of the evidence," the court, without more, launches into a discussion of the fact that the state's case hinges on Child A's credibility and then summarily concludes that excluding the Child B evidence will "significantly reduce the state's chances of a successful prosecution." So much for strictly construing our rules governing prosecution pretrial appeals.

Interestingly, the court states, with a great deal of certainty, "[e]xclusion of Child B's testimony would make it practically impossible for the state to demonstrate a pattern of conduct or design by McLeod to abuse male teenage patients when they were alone with him in his examination room." How the court can reach this conclusion without knowing all the admissible evidence is puzzling. In reaching the conclusion that the exclusion of the Child B evidence will "significantly reduce the state's chances of a successful prosecution" without first assessing its exclusion in light of all the admissible evidence, the court disregards our standard for assessing critical impact. How can the impact of excluding the evidence related to Child B be assessed without having the admissible evidence delineated? The court attempts to explain this inconsistency away by claiming "the structure of the facts and arguments is sufficiently established in this case to determine that the excluded evidence would have a critical impact at trial." This explanation does not change the state of the law: the court must examine all of the admissible evidence. *In re L.E.P.*, 594 N.W.2d at 168. Yet the state, as the court admits, has not even attempted to delineate all of the admissible evidence. Given that the state has failed to delineate the admissible evidence, which therefore cannot be assessed

to determine the impact of excluding the evidence related to Child B, I would conclude that the state has not met its burden of establishing critical impact.

Three explanations come to mind for the court's conclusion that the state has met the requirement of establishing critical impact without having assessed the impact of the Child B evidence in light of the other admissible evidence. One, the court has decided to apply the requirement in some cases, but not others, based on whim. Two, the court has, without saying so, simply changed the standards for assessing critical impact. Or three, the court has, again without saying so expressly, concluded that in child sexual abuse cases the exclusion of evidence relating to other acts of alleged sexual abuse by the defendant will always have a critical impact on the state's ability to prosecute the case, presumably because without the evidence the state will not be able to show a pattern of conduct by the defendant. It is my hope that the court's decision is not based on either of the first two explanations. I assume that its decision is based on the third. But, if the court is changing the rules for assessing critical impact in child sexual abuse cases, it should do so explicitly. It should also explain why it is changing the rules. Unfortunately, it has done neither. It certainly must do more than merely assert that the factors present in this case—"Child A's allegations are the primary evidence, Child A's credibility is affected by his delay in reporting abuse alleged to have occurred over a continuation of appointments with the alleged abuser, Child A has a reported history of psychological problems, and Child B has come forward with similar allegations,"—warrant a critical impact determination.[1]

I am also troubled by the court's critical impact decision because it implies that the

---

1. The court's explanation for its failure to require a delineation of all of the admissible evidence is flawed. The court uses the very

evidence that it is analyzing for critical impact—the Child B evidence—as justification

pretrial exclusion of evidence of other crimes, wrongs, or acts will always have a critical impact. Evidence of other crimes, wrongs, or acts is by its nature inadmissible except to the extent that Minn. R. Evid. 404(b) makes it admissible. Yet, to the extent that our precedent allows the admission of that evidence only when the state's case is weak and the evidence is needed to bolster the prosecution's burden of proof,[2] there will always be a critical impact under the court's analysis if the evidence is excluded pretrial.

It is true, as the court notes, that excluded evidence may have "a critical impact not only when the excluded evidence 'completely destroys' the state's case, but also when excluding the evidence 'significantly reduces the likelihood of a successful prosecution.'" However, it seems to me that when the evidence being excluded is by its very nature inadmissible, except un-

der limited circumstances, something more than a significant reduction in the likelihood of a successful prosecution should be required before critical impact will be found. This is especially true when the evidence in question is highly inflammatory evidence involving child sexual abuse that can easily persuade by illegitimate means.

Having reached the conclusion that the state has not met its burden of establishing that the exclusion of the Child B evidence will have a critical impact on the prosecution, I would not reach the merits of whether that evidence was properly excluded.

ANDERSON, PAUL H., J. (dissenting).

I join in the dissent of Justice Page.

for a finding of critical impact. Logically, the Child B evidence can only be evaluated for its critical impact in light of all the other admissible evidence.

I would also note that the factors the court contends justify its consideration of critical impact without requiring delineation of the other admissible evidence in this case are not as unique as the court implies. In almost every sexual abuse case, particularly child sexual abuse, the victim's allegations will be the primary evidence. As such, the victim's credibility will be an issue. Moreover, the questions regarding Child A's psychological health go to nothing more than the issue of credibility. Delayed reporting, which is typical in child sexual abuse cases, also goes to the victim's credibility. If almost every case of sexual abuse involves the factors relied on here, the court's holding will impact far more than the specific situation presented here. In

essence, the holding will allow courts to determine critical impact without examining all admissible evidence in every sexual abuse case.

Finally, with respect to the court's statement that the determination of critical impact "is, by its nature, forward-looking," I would note that, while a critical impact determination is always forward-looking, under our cases the forward look must be considered in light of the admissible *evidence*. Here, the court has made the critical impact decision without even having the admissible evidence delineated.

2. *See State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284 (1967) ("Evidence of other crimes is admissible only if the trial court finds the direct or circumstantial evidence [ ] is otherwise weak or inadequate, and that it is necessary to support the state's burden of proof.").